Marie Faye EVANS, Plaintiff-Appellee,

v.

**HARTFORD LIFE INSURANCE COMPANY, a Massachusetts corporation, and Dick Tanner, Defendants-Appellants.**

No. 80–2284.

United States Court of Appeals, Tenth Circuit.

April 11, 1983.

Rehearing Denied May 24, 1983.

Elsie C. Draper of Gable, Gotwals, Rubin, Fox, Johnson & Baker, Tulsa, Okl., for defendants-appellants.

Paul F. McTighe, Jr., Tulsa, Okl., for plaintiff-appellee.

Before SETH, Chief Judge, McWILLIAMS and SEYMOUR, Circuit Judges.

SEYMOUR, Circuit Judge.

Hartford Life Insurance Company (Hartford) appeals a district court order reforming a life insurance policy to extend coverage to plaintiff Marie Evans' deceased husband, Robert Evans. We reverse.

Robert Evans (Evans) was an employee of Dresser Engineering Company (Dresser), a gas field engineering and construction company. Evans completed a job for Dresser in February 1975. From that time through the end of 1975, Dresser had no available work for Evans because of the intermittent nature of its business. In order to maintain an available pool of construction workers willing to move from state to state when the company contracted to work on a construction project, Dresser retained laid-off workers as employees. In accordance with this practice, Evans was considered to be employed and on the payroll until his death, although he did not receive a paycheck after February 1975.[1] Dresser's shortage of projects continued through 1976, and on December 2, 1976, Evans died without having returned to work.

In March 1975, Dresser negotiated an employee group life insurance policy with Hartford. The standard policy provided that an employee's coverage would terminate on, inter alia, "the date on which the Insured Person's employment terminates. Termination of employment means cessation of active full-time work ...." Rec., vol. I, at 64. "Active full-time" was defined as "regularly employed by the Participant Employer in the usual course of such employer's business and work ... in no event less than 30 hours per week." *Id.* at 59.

The standard policy also provided that if an individual's employment terminated (as that term was defined in the policy) because of "temporary lay-off, owing to lack of work," coverage would continue "until the end of the policy month following the policy month in which the lay-off commenced." *Id.* at 64. In order to cover employees who, like Evans, were temporarily out of work, Dresser negotiated a rider to the policy. The rider, drafted by Hartford, provided that

"(1) Anything in the policy to the contrary notwithstanding:

---

1. It is quite clear that Dresser considered workers in Evans' position, *i.e.,* out of work through no fault of their own, to be full-time employees of Dresser, although they were not being paid. When such workers were not actively working, Dresser continued to keep life insurance and health and accident insurance coverage for them, and to retain them in the company pension plan. In addition, Evans received a full Christmas bonus in 1975, although he did not return to active work after February of that year. William Hansel, Dresser's secretary-treasurer and vice president of finance, who had negotiated the insurance policy with Hartford, testified that he did not consider workers in Evans' position to be on a leave of absence, but rather that "they are off work because of lack of work and that's not in my opinion a leave of absence." Rec., vol. II, at 38.

. . . .

(ii) If an Insured Person's employment terminates because of an approved leave of absence, . . . his insurance may be continued until the end of the twelfth policy month following the policy month in which the leave of absence commenced."

The group policy took effect on April 1, 1975. Following Evans' death, Dresser filed a claim that Hartford subsequently denied on the grounds that the coverage had terminated under the rider when twelve months elapsed without Evans returning to work.

This lawsuit followed. Marie Evans sought to recover on the group policy, or, in the alternative, to recover based on an alleged oral contract between Dresser and Hartford to cover persons in Evans' situation. After a trial to the bench, the court found that an understanding existed between Dresser and Hartford to cover employees in Evans' position. Consequently, the court reformed the policy to reflect this understanding. On appeal, Hartford argues that the evidence does not support the court's finding and that reformation was in error. Hartford also contends that Evans was not covered by the terms of the policy as written.

■ An insurance policy is generally regarded as a contract, and many of the traditional elements of contract law apply. Because of the nature of the typical insurance transaction, however, special rules of construction apply in addition to general precepts of contract law. Under Oklahoma law, insurance policies are treated as adhesion contracts. *Short v. Oklahoma Farmers Union Insurance Co.,* 619 P.2d 588, 589 (Okl. 1980). Although ambiguities and uncertainties in insurance policies are strictly construed against the insurance company, parties to the policy are bound by its provisions under contract law, and a company's legal liability will generally extend no further. *Travelers Insurance Co. v. Morrow,* 645 F.2d 41, 44 (10th Cir.1981); *see Badgett v. Oklahoma Life Insurance Co.,* 176 Okl. 86, 54 P.2d 1059, 1062 (1935).

The trial court did not specifically find the insurance policy as ridered to be unambiguous; however, this finding is implicit in the court's conclusion that reformation was needed to provide coverage for Evans. Under the plain and unambiguous terms of the policy, as amended by the rider, insurance coverage was provided for Evans for twelve months after the policy became effective on April 1, 1975. Consequently, unless the policy was properly reformed, insurance coverage of Evans terminated on March 31, 1976, because he did not return to active full-time work prior to that time.

■ An action seeking reformation proceeds from the premise that the parties came to an understanding but, when it was reduced to writing, some provision was omitted from the contract or a mistake was inserted through mutual mistake and fraud. *Agee v. Traveler's Indemnity Co.,* 264 F.Supp. 322, 326 (W.D.Okl.1967), aff'd, 396 F.2d 57 (10th Cir.1968). No reformation may be had unless there was a prior agreement to which the contract as written can be reformed. *Id.; Tuloma Pipe & Supply Co. v. Townsend,* 182 Okl. 321, 77 P.2d 535, 537 (1938); *Douglas v. Douglas,* 176 Okl. 378, 56 P.2d 362, 363, 369 (1936). An *agreement* must have been reached; a court will not reform an insurance contract to "conform to the parties' negotiations or haphazardly expressed intentions." *Industrial Indemnity Co. v. Aetna Casualty & Surety Co.,* 465 F.2d 934, 938 (9th Cir.1972). "Even in situations where obvious mistakes have been made, courts will not rewrite the contract . . . but will only enforce the legal obligations of the parties according to their original agreement." *Mutual of Omaha Insurance Co. v. Russell,* 402 F.2d 339, 344 (10th Cir.1968), *cert. denied,* 394 U.S. 973, 89 S.Ct. 1456, 22 L.Ed.2d 753 (1969). Because of the courts' traditional reluctance to disturb the terms of a written instrument presumably agreed to by both parties involved, a party seeking reformation under Oklahoma law must show by proof that is clear, unequivocal, and decisive, and more than a mere preponderance, that a prior agreement existed and that the contract

does not reflect that agreement because of fraud or mistake. *Agee,* 264 F.Supp. at 326; *Douglas,* 56 P.2d at 364, 369. The evidence must be sufficient to take the question out of the range of reasonable controversy. *Agee,* 264 F.Supp. at 326. *Douglas,* 56 P.2d at 364, 369. Even where a prior agreement is established, the party seeking reformation must also prove that the written instrument differs because of mutual mistake or fraud.

The trial court found as a matter of fact that Evans' employment with Dresser was not terminated prior to his death, and that "it was the understanding of both Dresser Engineering Company and Hartford Life Insurance Company ... that employees such as Robert Evans would be insured under the terms of the group policy," Rec., vol. I, at 47. The court concluded as a matter of law that "[t]he insurance agreement should be reformed to state the understanding reached between Dresser and Hartford that employees such as Robert Evans who were on a leave of absence status for lack of work were insured so long as their premiums were paid by the employer." *Id.* at 48. The court entered judgment under the reformed insurance contract in the amount of $24,000 plus costs and reasonable attorney's fees.

The trial court's factfinding that Hartford and Dresser intended to provide coverage for employees laid off of work but still considered by Dresser to be employees, must be upheld unless clearly erroneous. Fed.R.Civ.P. 52(a). However, we must also consider the rigorous standard of proof required by Oklahoma law as a prerequisite to reformation. Our scope of review is "whether the facts on which the judgment of the trial court is based meets [sic] the required degree of proof." *Ohio Casualty Insurance Co. v. Callaway,* 134 F.2d 788, 789 (10th Cir.1943). In *Ohio Casualty,* a contract reformation case, we clearly incorporated the state law standards into our examination. We do so in this case as well.

Our review of the record leaves us convinced that William Hansel, who negotiated the group policy for Dresser, wanted the policy to cover all persons he considered to be Dresser employees, regardless of the length of time that work was unavailable for them.[2] However, we have no such conviction regarding Hartford's understanding. Hartford clearly understood that Dresser wished to provide coverage for out-of-work employees, and Hartford knew that Evans and another employee were on lay-off status when the insurance contract was negotiated. There is absolutely no evidence, however, that Hartford was ever informed an employee might remain on lay-off status more than a year. In fact, the testimony of Hansel is to the contrary:

"Q. Did you tell Mr. Tanner [Hartford's representative] how long these employees might be out of work?

A. I may have given him a shotgun estimate and I don't remember the details.

Q. What would that estimate have been?

A. Oh, it could have been from three weeks to six months or longer.

Q. Did you ever have employees who were off more than six months?

A. In 1962 our field was out of work completely and for a matter of darn near a year, we had very little field construction going and we kept the employees then.

Q. When you say 'darn near a year', was this less than a year in 1962?

A. I don't recall the exact timing but it was—it was close, give or take, just under or just over.

Q. Excuse me. *Was there any time after 1962 and up to 1975 when you had any employee who was off for more than six to nine months between jobs?*

A. *Not that I recall, no, ma'am.*

Q. *Would there have been any reason then to suggest to Mr. Tanner that you needed coverage for more than one year?*

A. I don't—*I don't think that in my thinking I would have thought that that was necessary.*

---

**2.** *See* note 1 *supra.*

Q. Did you tell him you wanted coverage to extend for more than one year for employees out of work?

A. I told him at the time that I wanted employees to be covered that Dresser considered employees." [3]

Rec., vol. II, at 39–40 (emphasis added). Tanner testified he understood that the period of unemployment might last up to nine months.

■ The record nowhere reflects that Hartford agreed to provide coverage for employees, however long inactive, until Dresser actively terminated their employment. Hansel may have told Tanner that Dresser wanted inactive workers to be covered as long as Dresser considered them to be employed and paid their premiums. However, as Hansel conceded, at the time of the negotiations neither party had any reason to believe coverage was needed for more than a year, and the matter simply was not discussed. Thus, there is no evidence that Hartford either agreed or intended to provide insurance coverage for laid-off employees no matter how long they remained in that status. Applying the Oklahoma requirement of clear and convincing evidence, we have a definite and firm conviction that the trial court was mistaken in its conclusion to the contrary.

■ Even if Dresser intended to obtain such coverage, its unilateral understanding does not provide the mutual agreement and mutual mistake required to support reformation.[4] As one insurance authority has said with regard to reformation of a policy:

"A mistake on one side only would be insufficient, such as where the policy ac-curately expressed the intent of the insurer, even though it did not express the intent of the insured. And the insured's lack of knowledge or ignorance of the coverage actually extended to him by the insurance policy has not been considered a mistake of fact so as to permit reformation."

13A J. Appleman & J. Appleman, Insurance Law and Practice ¶ 7608 at 308–09 (1976) (footnotes omitted).

■ It is clear that the rider proffered Dresser by Hartford did not offer to cover Dresser's employees on indefinite leave of absence for lack of work. The rider limits coverage of laid-off workers to twelve months, after which they are considered "terminated" and thus ineligible for benefits under the policy. The rider was in typewritten form, not fine print. Moreover, Tanner sent a letter explaining and confirming the twelve-month provision to Hansel three weeks after the policy's effective date. Tanner later discussed this letter with Hansel, and no objection to the twelve-month limit was raised. The rider was accepted by Dresser without objection, and Dresser subsequently paid premiums and renewed the policy without disputing the policy terms. The parties are therefore bound by the rider's clear and unambiguous terms. *Nossaman v. Northwestern National Life Insurance Co.,* 376 P.2d 622, 625 (Okl.1962); *Badgett v. Oklahoma Life Insurance Co.,* 176 Okl. 86, 54 P.2d 1059, 1062 (1935).

Both parties raise additional issues on appeal that were not argued to the trial

---

**3.** When questioned as to how Dresser determined when a laid-off employee was terminated, Hansel testified that he usually made the determination. If he heard the employee had gone to work for someone else, he would inquire further. However, just because an employee was temporarily working on a construction project for another company did not mean Hansel considered him terminated as a Dresser employee. And a laid-off employee could turn down an offer of Dresser work and still be considered an employee on laid-off status. Thus, Hansel testified:

"Q. How many jobs could he turn down before you wouldn't consider him an employee anymore?

A. I think it would depend on a discussion with our vice president of construction and the superintendent or foreman that the man had been working with.

Q. This would be again a subjective determination by you and whomever you consulted at Dresser?

A. More or less, yes."

Rec., vol. II, at 46–47.

**4.** Marie Evans does not argue that Hartford acted fraudulently in negotiating this policy.

court. It is elementary that "[o]n appeal the parties are restricted to the theory on which the cause was prosecuted or defended below." *Jones v. Tower Production Co.,* 120 F.2d 779, 782 (10th Cir.1941). *See e.g., Bradford v. United States ex rel. Department of Interior,* 651 F.2d 700, 704 (10th Cir.1981). The parties have waived these arguments by not presenting them to the trial judge. *See United States v. Jones (In re Grand Jury Proceedings),* 517 F.2d 666, 675 (5th Cir.1975).

We hold that the trial court erred in ordering reformation of the contract. We reverse and remand to the trial court for entry of judgment in accordance with this opinion.

SETH, Chief Judge, dissenting:

I must respectfully dissent from the majority opinion's application of the doctrine of reformation. The case concerns a self-administered group life policy covering employees of Dresser Engineering Company. The basic policy coverage was changed by a rider.

The appellant states that the construction of this rider is the issue, thus:

"The construction of this rider and the negotiation between the parties resulting in the adoption of the rider as it applies to Robert Evans is the sole dispute between the parties."

There was correspondence concerning changes in the policy. There was testimony concerning some of the subjects of the rider. The rider covers several subjects and was not drafted as if they were related, and they are not necessarily related as to subject matter. Paragraph (1) of the rider states "[a]nything in the policy to the contrary notwithstanding" with a (i) paragraph and a (ii) paragraph, and thus to override anything in the policy. Paragraph (2) of the rider recites instead that it *amends* a provision in the policy "to read as follows."

The rider in (1)(i) and (ii) adds to the policy coverage for employees who are on approved leave of absence, and thereby creates a separate category of covered employees to meet Dresser's employment practices and policies.

The second portion of the rider (paragraph (2)) refers to a definition already in the policy as to the term "active full-time" employment and provides a yearly total of hours to come within the definition. This definition relates in turn to the definition in the policy of "termination." "Termination" as to employees generally means the cessation of "active full-time work." The balance of the rider concerns matters not here concerned.

The rider in (1)(i), because it relates to those on leave, is directed to those persons who at the effective date of the rider were on "an approved leave of absence." The deceased was covered by this (i) paragraph as he was then on an approved leave of absence. He was in that category.

The (1)(ii) paragraph of the rider also relates to those on leave and continues coverage for a period of one year "[i]f an Insured Person's employment terminates because of an approved leave of absence." The word "because" creates a problem and an ambiguity as the termination of "employment" there considered is restricted to one "because of," or thus by reason of the "approved leave." There was no employment termination "because" of the approved leave in the case before us. The trial court found as a fact that there was no "termination" at all.

It must be noted that in this rider, paragraph (1)(ii), the reference is only to those whose "employment terminates." This is not a termination of active status, nor a termination of coverage but instead an end to employment with Dresser. It is not termination of employment "for the purpose of this policy," or otherwise qualified, but instead is an unqualified end of employment. It is difficult to see how this could be brought about except by an affirmative act of the employer. It could not result from a life insurance policy definition. The employer here considered the insured to be an employee, and its acts so demonstrated.

Thus for employees who were on approved leave the rider overrode the policy

provisions relating to and defining "active full-time" work. This separate category was inserted to meet particular circumstances at Dresser. The cessation of full-time work as a "termination" was covered by the policy itself, and well defined, but only for situations not removed by the rider. This is what riders are for.

We are concerned only with this insured who was on an approved leave of absence when his coverage was created by the rider, and a person who was on the same leave of absence when he died. His "employment" could not have been terminated "because" of this leave.

The "construction" of the rider is thus a matter of resolving an ambiguity, and was resolved by the trial court on its determination of credibility of the witnesses who appeared before him. The rider needed no reformation but "construction" as appellant states. The trial court used the term "reformation," but this cannot be determinative, nor need be considered by this court as the only applicable doctrine.

The testimony demonstrated that the deceased was on an approved leave; his employment was not terminated by Dresser (the trial court expressly so found), and instead he was considered by Dresser to be an employee at the time of his death; he received benefits as such; and Dresser paid the premiums on the policy to the Company including those for the decedent.

I would thus affirm the judgment of the trial court.