EXXON CORPORATION,
Plaintiff–Appellee,

v.

Allen GANN, Defendant–Appellant.

No. 93–6130.

United States Court of Appeals,
Tenth Circuit.

April 11, 1994.

Michael Paul Rogalin of Rogalin & Carpenter, P.C., Oklahoma City, OK, for appellant.

J. Scott Carothers, Exxon Co., U.S.A., Houston, TX, for appellee.

Before BALDOCK, Circuit Judge, BARRETT, Senior Circuit Judge, and BRORBY, Circuit Judge.

BARRETT, Senior Circuit Judge.

Allen Gann (Gann) appeals from the district court's judgment entered in favor of Exxon Corporation (Exxon), 1993 WL 645058. Exxon brought this action against Gann seeking reformation of an Assignment and Bill of Sale (Assignment) of oil and gas leases from Exxon to Gann on the basis of mutual mistake. Gann claimed that there was no mutual mistake in the Assignment and that the Assignment was clear and unambiguous. Gann counterclaimed for quiet title, slander of title, and an accounting of proceeds.

*Pleadings*

In its complaint Exxon alleged that the agreement of the parties at the sale on Au-

gust 28, 1991, was that only Exxon's interest in the Snider B 1–24 well (Snider well) would be conveyed to Gann and that by mutual mistake the actual assignment contained language purporting to convey to Gann Exxon's interest in two other wells, Searcey Ramona 1–24 and 2–24 (Searcey wells), as well as the Snider well.

In his answer, Gann denied there was any mistake on his part. He alleged that he intended to purchase Exxon's entire interest in the Lower Des Moines common source and supply as set out in the Assignment. Gann further claimed Exxon had no right, title or interest in any of the wells involved in this action; Exxon clouded and slandered Gann's title to the wells; and Exxon refused to pay him proceeds attributable to the wells.

*Facts*

Exxon is a New Jersey corporation with its principal place of business in Texas. In August, 1991, Exxon offered certain oil and gas properties for sale at oral auction, including the Snider well in section 24–13N–20W Custer County, Oklahoma. The auction was conducted by EBCO Resources, Inc. (EBCO).

In early August, Gann received a sales brochure from EBCO advertising the sale. Gann reviewed the sales brochure to determine the parameters of the sale and determined it was a no minimum, no reserve, no bid in, no buy back sale to be conducted by oral bid. Gann understood the description of the properties set out in the brochure was for general information only, not to be relied upon, and that he should conduct his own due diligence prior to the sale.[1] The brochure further advised bidders to review the assign-

---

1. Paragraph 7 of the Buyer's Terms and Conditions of Sale reads: All descriptions of properties in the sale, including any published in sale brochures or promotional material, have been supplied by Seller for the sole purpose of identifying the location of such properties ... BIDDER UNDERSTANDS AND AGREES THAT SUCH DESCRIPTIONS AND OTHER INFORMATION ARE PROVIDED BY SELLER AND DELIVERED BY EBCO FOR GENERAL INFORMATION ONLY, AND THAT NO GUARANTEE OR WARRANTY AS TO THE ACCURACY OR SUITABILITY FOR USE OF THE DESCRIPTION OR OTHER INFORMATION IS MADE. EBCO AND SELLER MAKE NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, ON THE PROPERTY LISTED FOR SALE AS TO ITS OIL AND/OR GAS PRODUCTION, TITLE, CONDITION, QUALITY, FITNESS FOR GENERAL OR PARTICULAR PURPOSE, MERCHANTABILITY OR OTHERWISE AND DO FURTHER STATE THAT ALL PROPERTY IS SOLD "AS IS", WITHOUT RECOURSE. DUE DILIGENCE IS REQUIRED.... THE BIDDER IS RESPONSIBLE TO SATISFY HIMSELF PRIOR TO THE SALE AS TO THE INFORMATION CONCERNING AND CONDITIONS OF THE PROPERTIES AND INTERESTS BEING SOLD. (Appellant's Appendix at 738).

ment before bidding for additional terms, provisions, assumptions of risks, including indemnities, which affect the buyer's ownership of the properties.

Prior to the sale, Exxon made available well and production data for each sale property. Gann reviewed the data referencing the "Snider 'B' Unit No. 1–24". No data on the Searcey wells was made available to the buyers nor were these wells mentioned in any of the brochures or catalogs.

Gann testified that in addition to the information provided by Exxon and EBCO, he reviewed completion reports on some of the sale properties. He stated that based on these reports he determined there were three wells, the Snider well and the two Searcey wells, located in section 24–13N–20W Custer County, Oklahoma, which he believed were all producing from the Lower Des Moines common source and supply.

On the day of the sale, Gann received a sale catalog which listed the properties to be sold by lot number. The Snider well was Lot 9. The same disclaimers found in the sales brochure were found in the sale catalog directing the bidder to review the assignment before bidding and not to rely on the other data provided.

Gann reviewed a copy of the Assignment for the first time on the day of the sale. Exhibit A of the Assignment entitled "SNIDER 'B' UNIT NO. 1–24" conveyed "ALL OF EXXON CORPORATION'S RIGHT, TITLE, AND INTEREST IN AND TO THE FOLLOWING OIL AND GAS LEASES AND AMENDMENTS THERETO INSOFAR AND ONLY INSOFAR AS THEY COVER SECTION 24–13N–20W, CUSTER COUNTY, OKLAHOMA, ONLY AS TO THE LOWER DES MOINES COMMON SOURCE OF SUPPLY." (Appellant's Appendix at 856).

At the auction, Gann was the successful bidder on Lot 9 at $700.00. He tendered a check to Exxon for $744.12 for the purchase price, taxes and recording fees.

In September, Gann and Exxon executed the Assignment and it was recorded in Book 847, Page 96, of the records of the County Clerk of Custer County, Oklahoma. Subse-quently, Gann and Exxon executed a Letter-in-Lieu of Transfer Order to inform Louisiana Land & Exploration, the operator of the Snider well, of the transfer of Exxon's interest to Gann.

In October, 1991, Exxon discovered a mistake had been made in the Assignment. Exxon alleged that the parties intended to convey only Exxon's interests in the Snider well but that the Assignment purported to convey Exxon's interests in the Snider well *and* the Searcey wells due to its language referring to the "Lower Des Moines Common Source of Supply."

Prior to the sale, Exxon hired Texas landman Miles Dart to prepare the title work for the sale properties. Dart knew that only the Snider well was being sold out of section 24–13N–20W. In doing the title work, Dart determined the Snider and Searcey wells were producing out of different formations, the Lower Des Moines and the Red Fork, respectively. He relied on Dwight's Energydata, Inc. (Dwight's), purportedly one of the best sources of well history, to make this determination. Therefore, Dart restricted the language of the Assignment to the "Lower Des Moines Common Source of Supply" in order to convey only the Snider well. Although Dwight's listed the wells in separate formations, all three wells were in fact producing from the same formation, the Lower Des Moines.

Exxon immediately prepared an Amendment to Assignment and Bill of Sale which restricted the conveyance to Exxon's interest in "those hydrocarbons produced from the wellbore of Snider 'B' Unit No. 1–24 Well from the Lower Des Moines Common Source of Supply." (Appellant's Appendix at 970). Gann refused to sign the Amendment to Assignment.

Sometime after the sale, Gann contacted several people at Exxon to see if he could buy Exxon's remaining interest in section 24. Gann represented that he was interested in purchasing Exxon's interests in all formations other than the Lower Des Moines. In connection with this inquiry, Gann requested production information on the Searcey wells. The production information showed that the

Searcey wells produced an average of 50 barrels of oil and 3,817 MCF of gas per day (compared to the 4 barrels of oil and 90 MCF of gas per day for the Snider well). The Searcey wells generated an annual income in excess of $39,000, whereas, the Snider well generated approximately $350 annually.

Exxon subsequently filed suit seeking reformation of the Assignment to reflect the intentions of the parties to convey Exxon's interests in the Snider well only. The matter was tried February 8 through 11, 1993. The reformation, quiet title and accounting claims, equitable in nature, were tried to the court. Gann's slander of title counterclaim was tried to a jury.

At the close of evidence, the district court entered a directed verdict in favor of Exxon regarding Gann's slander of title counterclaim. On March 5, 1993, the district court issued its Order with "Findings of Fact and Conclusions of Law" holding that the Assignment was not ambiguous but that Exxon was entitled to reformation and denying Gann's request for quiet title and accounting. Judgment was entered on March 16, 1993, in favor of Exxon reforming the Assignment.

On appeal, Gann contends that the district court erred in (1) granting Exxon reformation of the Assignment absent an antecedent agreement, (2) granting Exxon reformation because the mistake was caused solely by negligent acts of Exxon itself, and (3) applying a negligence standard in a mutual mistake case. Gann does not challenge the district court's order directing a verdict in favor of Exxon on Gann's slander of title counterclaim.

*Discussion*

**I.**

■ Both Exxon and Gann acknowledge that we must accept the district court's findings of fact unless clearly erroneous. *See United States v. Barbee,* 968 F.2d 1026, 1028 (10th Cir.1992). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Stegall v. Little Johnson Assoc., Ltd.,*

996 F.2d 1043, 1048 (10th Cir.1993). On appeal, we view the evidence in the light most favorable to the district court's ruling, *United States v. Soto,* 988 F.2d 1548, 1551 (10th Cir.1993), and must uphold any district court finding that is permissible in light of the evidence. *Hauptli v. Commissioner,* 951 F.2d 1193, 1195 (10th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1955, 118 L.Ed.2d 558 (1992).

■ An action seeking reformation proceeds from the premise that the parties came to an understanding but, when it was reduced to writing, some provision was omitted or inserted through mutual mistake or fraud. *Evans v. Hartford Life Ins. Co.,* 704 F.2d 1177, 1179 (10th Cir.1983). Exxon's claim for reformation rests on the grounds of mutual mistake.

■ The general rule is that when an instrument does not reflect the intentions of the parties because of mistake of fact, equity will correct such mistake unless the rights of third parties intervene. *Walter v. Myers,* 206 Okla. 100, 241 P.2d 393 (1952) (citing *Smith et ux v. Lindley,* 202 Okla. 501, 215 P.2d 566, 568 (1950)). Under Oklahoma law, mutual mistake requires proof by clear and convincing evidence of (1) an antecedent agreement to the terms of which the writing should be reformed; (2) a mutual mistake as a result of which the writing reflects something neither party intended; and (3) that the party seeking reformation was free of neglect. *Sabine Corp. v. ONG Western, Inc.,* 725 F.Supp. 1157, 1187–88 (W.D.Okla.1989); *see Cleary Petroleum Corp. v. Harrison,* 621 P.2d 528, 533 (Okla.1980).

**A.**

Gann contends that since there was no antecedent agreement between himself and Exxon, the district court erred in granting Exxon reformation of the Assignment.

■ Exxon claims that it intended to sell and Gann intended to buy only the Snider well. Exxon argues that the data provided before the sale, Gann's pre-sale conduct and Gann's post-sale conduct demonstrate that

Gann intended to buy only the Snider well and not the Searcey wells.

Gann refutes Exxon's characterization of his intent. He testified that based on his independent research before the sale and the copy of the Assignment he reviewed on the day of the sale, he knew there were three wells in section 24–13N–20W and intended to buy all three. Gann stated that he relied solely on his independent research and the Assignment to make his determination in light of the numerous disclaimers and warnings found on all other information provided by EBCO. Gann denied that his post-sale conduct in trying to purchase the remaining interest in section 24 showed anything more than his desire to acquire interest in other geologic formations besides the Lower Des Moines.

Upon hearing Gann's testimony and observing his demeanor, the district court stated that it "simply does not believe that Gann thought he was purchasing the three wells in question on the day of the sale [and] ... believes that Gann re-constructed how he might have been able to surmise on the day of sale that the three wells in questions were included in the assignment. In other words, after hearing Gann's testimony, the [c]ourt is left with the unsettling and firm conviction that Gann's testimony was motivated more by greed and opportunistic motives than by truth." (Appellant's Appendix at 8).

Based on Gann's credibility and Exxon's evidence, the district court found that at the time of the sale, Exxon intended to sell only the Snider well and Gann intended to buy only the Snider well. We hold that the record amply supports this finding and, based on this finding, the district court properly reformed the Assignment to reflect the original and true intentions of the parties.

### B.

Gann contends that the district court erred in granting reformation on the basis of mutual mistake when the error was caused solely by the negligent acts of Exxon.

Gann reiterates that under Oklahoma law the party seeking reformation on the grounds of mutual mistake must show he was free of neglect in making the agreement and must do so by clear and convincing evidence. *See Sabine*, 725 F.Supp. at 1187–88. Gann contends that Dart, Exxon's landman who made the error, was negligent in preparing the Assignment because he had no experience in Oklahoma law, had never done land work in Oklahoma, had no knowledge of Oklahoma title, and had no understanding of geologic formations. In addition, Gann points out that Dart admitted he assumed the Snider and Searcey wells were in different formations based on Dwight's information without doing any additional research to confirm his assumptions.[2]

Exxon argues that negligence is not an absolute bar to reformation. Exxon asserts that whether negligence is a bar to reformation must be determined based on the facts of each case. *See Crabb v. Chisum*, 183 Okla. 138, 80 P.2d 653, 655 (1938). Exxon contends that Dart's error did not violate any legal duty to Gann and that Gann suffered no injury as a result of the error. In addition, Exxon states that no evidence was presented that Dwight's was an unreliable source of information or that its use was negligent.

■ The courts have recognized that in cases where the parties are mistaken as to the contents of a written agreement, some form of negligence is nearly always present, *Anderson, Clayton & Co. v. Farmers Nat'l Bank of Cordell*, 624 F.2d 105, 109 (10th Cir.1980), and to require a party seeking equitable relief to be entirely free from neglect would effectively nullify the doctrine of reformation. *Crabb v. Chisum*, 80 P.2d at 655; *see also Oklahoma City Fed. Savings & Loan Ass'n v. Clifton*, 183 Okla. 74, 80 P.2d 283 (1938). To preserve the doctrine of mutual mistake, relief is denied only when there is "culpable negligence" and the neglect violates some positive legal duty. *Crabb*, 80 P.2d at 655. Therefore, even "clearly established negligence may not of itself be a suffi-

---

**2.** It is unclear whether Dart knew of the Searcey Ramona 2–24 well, but it is clear he knew of the Searcey Ramona 1–24 well and believed it to be producing in the Red Fork formation based on Dwight's listing.

cient ground" to deny reformation, if the other party has not been injured. *Id.*

■ In making its findings, the district court concluded that "to the extent negligence occurred by Exxon, if any, considering that an attorney reviewed the information provided by the landman, such negligence is insufficient to prevent or bar reformation." (Appellant's Appendix at 52). The district court also found that although Dart had little or no knowledge of Oklahoma law, the evidence did not show that his lack of knowledge caused the mistake and that the information available to Dart when he made his determinations would tend to mislead even those knowledgeable in Oklahoma law. Finally, the district court found that the "mistake was not caused by neglect of a legal duty." *Id.*

After careful consideration of the record, we hold that the district court's findings are not clearly erroneous. Therefore, we uphold the district court's decision to reform the Assignment to reflect the original intent of the parties.

## II.

Gann contends that the district court erred in applying a negligence standard in a mutual mistake case.

■ We consider questions of state law de novo. *Salve Regina College v. Russell,* 499 U.S. 225, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991). Thus, we apply the same standard of review the district court applied in making its initial decision, *Lilly v. Fieldstone,* 876 F.2d 857, 858 (10th Cir.1989), and are not constrained by the district court's conclusions. *FDIC v. Bank of Boulder,* 911 F.2d 1466, 1469 (10th Cir.1990), *cert. denied,* 499 U.S. 904, 111 S.Ct. 1103, 113 L.Ed.2d 213 (1991). We may affirm or deny on any adequate grounds adequately presented to the district court. *Medina v. City & County of Denver,* 960 F.2d 1493, 1500 (10th Cir.1992).

Gann claims the court improperly applied the balancing test used in unilateral mistake cases rather than the strict rule requiring the party seeking reformation to be free of neglect used in mutual mistake cases.

Oklahoma case law acknowledges that in a mutual mistake case reformation is not available unless the party seeking reformation was free of neglect in the making of the agreement, *Sabine,* 725 F.Supp. at 1187–88, but the Oklahoma courts have been reluctant to construe the requirement strictly. *See Webster v. Woods,* 586 P.2d 337, 339 (Okla. App.1978) ("But caselaw reflects that while the negligence of a party seeking to reform a written agreement may bar equitable relief, that the issue is a fact issue for the court of equity to judge in each case"); *Garrett v. Pollock,* 299 P.2d 516, 520 (Okla.1956) ("whether negligence by the party seeking reformation will bar relief is determinable from the facts of each case"); *Crabb,* 80 P.2d at 655 ("each instance of negligence must depend to a great extent upon its own circumstances"). Courts have also avoided this issue altogether by denying reformation absent a prior agreement of the parties or absent a mutual mistake. *See Western Ins. Co. v. Cimarron Pipe Line Constr. Inc.,* 748 P.2d 1397, 1399 (10th Cir.1984) (reformation denied because court found no mistake of fact); *Clayton v. Paul,* 292 P.2d 405, 407 (Okla.1956) (reformation denied because court found no prior agreement justifying reformation of the written agreement).

■ It is clear that the cases reaching the issue of whether negligence will bar reformation use a balancing test to determine whether the negligence rises to the level of "culpable negligence" which violates a legal duty. *Crabb,* 80 P.2d at 655; *see National Fire Ins. Co. of Hartford v. McCoy,* 239 P.2d 428, 430 (Okla.1951) (finding that it is the duty of the insured to read and know the contents of its policy before he accepts it and reformation based on mutual mistake will not excuse insured from neglect of their legal duty).

Here, the district court specifically found clear and convincing evidence of mutual mistake and that Exxon's negligence, if any, did not violate any legal duty nor reach the level of culpability necessary to bar reformation. In keeping with the court's determination in *Crabb* that negligence must be "culpable" and must violate some legal duty in order to

bar reformation, we agree with the district court's findings and conclusions.

AFFIRMED.