EBEL, Circuit Judge,
dissenting
I respectfully dissent on two independent grounds. First, the record supports — particularly under the clearly erroneous standard — the Tax Court’s factual finding that, “[wjhen the FDIC refused to honor [the] payment arrangement with regard to the Bank loan, a legitimate dispute arose regarding the nature and amount of [the Preslars’] liability on the Bank loan.” Tax Ct. Op. at 8. This factual finding properly triggers the contested liability doctrine. Second, the Preslars have a potential argument that they are entitled to a purchase-money debt reduction under Internal Revenue Code (“I.R.C.”) § 108(e)(5), 26 U.S.C. § 108(e)(5), as Moncor Bank could be viewed, for all substantive purposes, as the seller of the Ranch. On the first ground, I would affirm. Alternatively, if we do not affirm on the first ground, I would, at the least, remand on the second ground for a finding of fact as to whether Moncor Bank could be considered the seller of the Ranch.

I. Contested Liability

Under the contested liability doctrine or disputed debt exception, when “there is a legitimate dispute between a creditor and a debtor concerning the existence of a liability, and a compromise between the parties is reached, no discharge of indebtedness income will arise as to the contested and unpaid portion of the original liability.” 2 Mertens, Law of Federal Income Taxation, § 11.19 at 42 (1996) (citing Zarin v. Commissioner, 916 F.2d 110 (3d Cir.1990); N. Sobel, Inc., 40 B.T.A. 1263, 1939 WL 101 (1939)) (emphasis added). Thus, contrary to the majority’s view, the contested liability doctrine is not limited to instances where the taxpayer specifically disputes only the amount of the debt and the original amount was unliq-uidated.
Indeed, the facts of N. Sobel, the seminal contested liability case, belie the majority’s position. There, the taxpayer corporation issued a $21,700 note to pay for 100 shares of a bank’s stock. See N. Sobel, 40 B.T.A. at 1264. When the note became due, the corporation refused to pay, disputing not the amount of the note but rather the validity of the note itself “on the ground that the bank *1334 made the loan in violation of law and failed to carry out promises to guarantee the [corporation] against loss.” Id. The corporation and the bank settled the dispute for $10,850. The Board of Tax Appeals found no discharge of indebtedness income, even though the corporation did not dispute the amount of the debt and even though the original amount was liquidated (at $21,700). Id. at 1265. The Board held that the amount of the corporation’s liability was “not actual and present” until the corporation’s subsequent compromise agreement with the bank. Id. at 1265.
Given N. Sobel, I believe that the majority’s view that the contested liability doctrine applies only when the original amount of a debt is disputed and unliquidated is mistakenly narrow. This view ignores the fact that the original amount of a debt is necessarily disputed and may be unliquidated under a good faith dispute over liability “that can be traced to the circumstances in existence at the time of the debt’s creation.” William R. Culp, Jr., and Richard E. Marsh, Jr., Avoiding Cancellation of Debt Income Where the Liability is Disputed, 74 J. Tax’n 288, 292 (1991); see Zarin, 916 F.2d at 116 (“When a debt is unenforceable, it follows that the amount of the debt, and not just the liability thereon, is in dispute.”); cf. N. Sobel, 40 B.T.A. at 1265 (finding corporation’s liability was not “definitely fixed” until settlement of its bona fide dispute regarding validity of note). Only upon resolution of the dispute over the existence of liability traceable to the origin of the debt does the “question as to [the taxpayer’s] liability and the amount thereof’ become “actual and present by any practical purpose,” including taxation. N. Sobel, 40 B.T.A. at 1265. Thus, settlement of a dispute over the enforceability of a debt traceable to its origin, such as the settlements in N. Sobel and Zarin, does not result in a windfall. Such settlements merely establish the original amount of liability, as opposed to discharging any amount of the original liability.
In this case, the Tax Court made a finding of fact that the Preslars disputed with the FDIC both the nature and amount of their liability on the loan from Moncor Bank. As the majority acknowledges, the Tax Court accepted the Preslars’ contention that the $1 million purchase price for the Ranch had been inflated and that the Preslars and Mon-cor Bank had agreed to a correspondingly inflated method of repayment involving the assignment of installment sales contracts. See Tax Ct. Op. at 4, 7-8. According to the Tax Court, “[w]hen the FDIC refused to honor this payment arrangement with regard to the Bank loan, a legitimate dispute arose regarding the nature and amount of [the Preslars’] liability on the Bank loan.” Id. at 8. Thus, given the proper scope of the contested liability doctrine, I believe that the Preslars’ settlement with the FDIC would not result in discharge of indebtedness income if the Tax Court’s finding is correct.
The majority rejects the Tax Court’s finding, stating that “[t]he Preslars advanced no competent evidence to support their theory that their loan obligation was linked to the repayment scheme,” such that the FDIC’s refusal to abide by the scheme of inflated repayment would give rise to a dispute regarding the inflated principal of the loan. Ante at 1330. However, in arriving at this conclusion, the majority overlooks significant evidence in the record as well as the high standard of clear error for overturning the Tax Court’s factual finding. See 26 U.S.C. § 7482(a)(1) (circuit courts review Tax Court decisions “in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury”); Exxon Corp. v. Gann, 21 F.3d 1002, 1005 (10th Cir.1994) (viewing the evidence “in the light most favorable to the district court’s ruling,” we “must accept the district court’s findings of fact unless clearly erroneous,” that is, unless “on the entire evidence [we are] left with the definite and firm conviction that a mistake has been committed.”) (citations and quotations omitted).
Under the clear error standard, I believe we must affirm the Tax Court’s finding. The record contains ample evidence upon which the Tax Court could have concluded that the Preslars disputed the initial nature and amount of their liability on the Bank loan. Specifically, the record contains evidence that: (1) during negotiations for the Ranch, Layne Preslar (“Preslar”), an experienced real estate broker, and the Bank had con- *1335 eluded that the fair market value of the Ranch was considerably less than $1 million, (Tr. at 79)[1]; (2) the Bank nevertheless reassured Preslar that the deal for the Ranch would work if Preslar could make the sales of the cabin lots, (Tr. at 79-80); (3) the terms of the deal for the Ranch included the Bank purchasing the installment sales contracts of the cabin lots at 95 percent face value under the Dealer Agreement, (Tr. at 80); (4) the standard percentage for the purchase of such contracts was 35 percent, (Tr. at 110); (5) the Preslars purchased the Ranch in 1983 at the $1 million price based upon the Bank’s agreement to accept the assignment of installment sales contracts as payment, (Tr. at 82); (6) from the first sale of cabin lots in 1984 until Moncor Bank’s bankruptcy in 1985, Preslar sold 19 cabin lots and assigned all the installment sales contracts received from purchasers to the Bank, (Tr. at 85, 93); (7) when the FDIC became the receiver of the Bank, it refused to accept further assignments of these installment sales contracts as payment, (Stip.# 34); (8) that, in the alternative to accepting the assignments as payment, the Preslars wanted the FDIC to discount substantially the remaining amount due on the Bank Loan, (Stip.# 35); (9) during settlement agreements with the FDIC, the value of the Ranch was appraised at $550,000 by a bank financing the Preslars’ settlement, (Tr. at 98); (10) Preslar settled his loan with the FDIC for a $350,000 payment, (Stip.# 39); and (11) the total amount the Preslars ended up paying for the Ranch was $550,537 (the $350,000 settlement payment plus $200,537 in installment payments previously received by the Bank) (Stip.# 40).
From the above evidence, taken from Preslar’s testimony at trial and the Stipulation of Facts agreed to by both parties,[2] the Tax Court could permissibly conclude that “a legitimate dispute arose regarding the nature and amount” of the Preslars’ liability on the Bank loan once the FDIC refused to accept what the Preslars argued were the original terms allowing him to make payment by assigning installment sales contracts. The evidence would allow the Tax Court to infer that the purchase price of the Ranch was inflated; that the Preslars nevertheless agreed to the Ranch deal, even though the Bank insisted on an inflated purchase price, because they wanted the deal to go through and the Bank agreed to an inflated method of repayment; that the Preslars disputed the nature and amount of their liability on the loan when they requested the FDIC to discount the remaining balance if it would not accept further assignments of sales contracts as payment[3]; and that this dispute is traceable to the origins of the loan. Additionally, the fact that the total amount the Preslars ended up paying for the Ranch ($550,537) approximated the appraised value of the Ranch at the time of settlement negotiations with the FDIC ($550,000) gives further evi-dentiary support to the Tax Court’s conclusion that the Preslars disputed the nature and amount of their liability: once deprived *1336 of the inflated medium of repayment for a loan based upon an inflated purchase price, the Preslars settled for an uninflated repayment sum approximately equal to an uninflat-ed purchase price.[4]
Thus, because the evidence, viewed “in the light most favorable” to the Tax Court’s ruling, does not leave me “with the definite and firm conviction that a mistake has been committed,” Exxon, 21 F.3d at 1005, I do not believe that the Tax Court’s finding that the Preslars disputed the nature and amount of their debt is clearly erroneous. Accordingly, I would affirm that finding. As a result, I would also affirm the district court’s conclusion that the contested liability doctrine precludes settlement of that dispute from generating discharge of indebtedness income.
Such affirmance, however, should be subject to a caveat. Lurking beneath the Pres-lars’ contention that both the purchase price and the medium of repayment were inflated is the possibility that the Preslars aided Moncor Bank in the commission of fraud. The Preslars explain that the “[t]he purchase price financing of Moncor bank was nothing more than an attempt to pacify bank regulators,” because the inflated price would allow Moncor bank “to perpetrate a fiction that a nonperforming loan was satisfied.” (Aplee. Br. at 3.) Because the contested liability exception is an equitable doctrine, unclean hands on the part of the Preslars would preclude them from taking advantage of it. See Hocker v. New Hampshire Ins. Co., 922 F.2d 1476, 1486 (10th Cir.1991). Thus, even with an affirmance, I would remand for a determination of the Preslars’ role in the deception perpetrated against bank regulators. If the Preslars were involved in fraud, I would not allow them the benefit of the contested liability doctrine.
Two additional points in the majority’s discussion of the contested liability doctrine merit comment. First, the majority relies on Commissioner v. Tufts, 461 U.S. 300, 103 S.Ct. 1826, 75 L.Ed.2d 863 (1983), which held that cancellation of a nonrecourse loan realizes discharge of indebtedness income. See id. at 311-13, 103 S.Ct. 1826 (1983). The majority believes that this “underscore^]” its own holding that cancellation of an unenforceable debt realizes discharge of indebtedness income, stating that “if the distinction between the recourse and nonrecourse nature of a loan has no bearing on calculation of gross income, the enforceability of a debt should be of equally minimal importance.” Ante at 1329.[5] Although unstated, the only way Tufts ’ holding “underscores” the majority’s holding is if a nonrecourse loan is treated as the functional equivalent of an unenforceable debt.
To the extent the majority relies on this premise, I disagree. Nonrecourse loans and unenforceable debts are not functional equivalents. Nonrecourse loans are enforceable, unenforceable debts are not. A party may sue to collect on a nonrecourse loan, but cannot sue to collect on an unenforceable debt. While a taxpayer has no personal lia *1337 bility upon default of a nonrecourse loan, the taxpayer nonetheless is always liable for the loan. That liability merely is capped by the value of the underlying security interest. See Michael J. Graetz & Deborah H. Schenk, Federal Income Taxation 194 (3d ed.1995). Given an unenforceable debt, the taxpayer has no liability. This distinction can make all the difference for tax purposes.
For example, Tuft s held that a nonre-course mortgage, like a recourse mortgage, must be treated as a true loan for tax purposes, so that a disposition of secured property where the buyer assumes the nonre-course mortgage would result in a realization by the seller of the full unpaid balance of the mortgage, even if the value of the secured property is less than that of the unpaid balance. See 461 U.S. at 311-13, 103 S.Ct. 1826; see also Marvin A. Chirelstein, Federal Income Taxation 291-92 (1997) (discussing Tufts). In so holding, the Supreme Court reasoned that “[t]he only difference between [a nonrecourse] mortgage and one on which the borrower is personally liable is that the morgagee’s remedy is limited to foreclosing on the securing property,” and that this “difference does not alter the nature of the obligation; its only effect is to shift from the borrower to the lender any potential loss caused by devaluation of the property.” Tufts, 461 U.S. at 311-12, 103 S.Ct. 1826. Hence, “[w]hen the obligation is canceled, the mortgagor is relieved of his responsibility to repay the sum he originally received and thus realizes value to that extent.” Id. at 312, 103 S.Ct. 1826.
From Tufts’s reasoning, it is apparent that the lack of distinction between a nonrecourse and a recourse debt for discharge of indebtedness purposes does not negate but rather reinforces the applicability of the contested liability doctrine in this case. Because a nonrecourse debt is an enforceable obligation to repay, the cancellation of that debt would result in discharge of indebtedness income. Although the mortgagee’s only remedy upon default is acquisition of the secured property, that limited remedy does not affect the mortgagor’s gain upon cancellation of the mortgage. That gain is the difference between the original amount of the debt which the mortgagor was obligated to repay and the canceled balance. In contrast, the borrower realizes no economic gain in the settlement of disputed debt which is unenforceable for reasons relating back to the origin of the debt. The settlement determines the original amount of liability. See N. Sobel, 40 B.T.A. at 1265; Zarin, 916 F.2d at 116. On the other hand, cancellation of an enforceable debt would realize income to the extent of the discharge. See United States v. Kirby Lumber Co., 284 U.S. 1, 2, 52 S.Ct. 4, 76 L.Ed. 131 (1931).
Thus, contrary to the majority’s reasoning, I believe an unenforceable debt is not the functional equivalent of a nonrecourse loan either in concept or in consequence, and the enforceability of a debt is of critical importance for purposes of the contested liability doctrine. Indeed, although cancellation of a nonrecourse loan ordinarily would result in discharge of indebtedness income, cancellation of a nonrecourse loan which is unenforceable for a reason relating back to the origin of the loan might have no tax consequences. Cf. Culp & Marsh, supra, at 292 (both nonrecourse and recourse debts may “give rise to a good faith dispute to which” the contested liability doctrine might be applied).
The majority suggests another limitation to the contested liability doctrine, stating that “even if the Preslars could demonstrate the property was worth less than the purchase price, they still could not invoke the contested liability doctrine in the absence of proof the loan they executed was tainted by fraud or material misrepresentations.” Ante at 1330-31. It is unclear whether the majority would require a showing of fraud or material misrepresentation in all invocations of the contested liability doctrine or only in cases where the value of property purchased is less than the stated purchase price. Regardless, no ease law or commentary on the doctrine of contested liability requires proof of fraud or material misrepresentation generally or in the case at hand. Although the majority cites Commissioner v. Sherman, 135 F.2d 68 (6th Cir.1943), nowhere in the case does the Sixth Circuit state or imply the limitation suggested by the majority. Indeed, in reaching its holding that the taxpayers did not realize discharge of indebtedness *1338 income, Sherman did not discuss the contested liability doctrine, but rather relied on the purchase-price reduction doctrine. See id. at 70.
Moreover, I believe the majority’s focus on the value of the property received is misplaced. For purposes of the contested liability doctrine, the value of what a taxpayer receives as consideration for entering into debt is not in itself dispositive. Instead, what is critical is what a taxpayer gives up, as that amount goes to the taxpayer’s liability. See Culp & Marsh, supra, at 290 (“The disputed liability doctrine should focus on the indebtedness created, not on the property received.”) In this ease, however, it just so happens that the value of what the Preslars actually received (the Ranch) is probative of what the Preslars actually gave up (their indebtedness to Moncor Bank), because Mon-cor Bank agreed from the outset to an inflated medium of repayment on its loan to match an inflated purchase price for the Ranch.

II. Purchase-Money Debt Reduction under I.R.C. § 108(e)(5)

I believe the Preslars’ have a potential argument that their settlement with the FDIC falls within the purchase-money debt reduction exception of I.R.C. § 108(e)(5), thereby rendering the settlement non-taxable. Although § 108(e)(5) only applies to reduction agreements between purchasers and sellers, the provision might possibly apply to the settlement between the Preslars and the FDIC. Section 108(e)(5) may apply because the FDIC merely took Moncor Bank’s place as its receiver, and Moncor Bank could be viewed for these purposes as the seller of the Ranch. Although High No-gal had formal title to the Ranch at the time it was transferred to the Preslars, it is arguable that the substantive attributes of title had already passed to Moncor Bank at the time of negotiations between Moncor Bank and the Preslars. The owner of High Nogal did not participate in the six-month negotiations leading up to the sale of the Ranch, (see ApltApp. # 2 at 3), considered the Bank the “true seller,” (Tr. at 118-19), and told Preslar to deal with the Bank because he had no control over any sale of the property, (Id. at 77-78). Additionally, the Bank financed the deal and received and disposed of all the assets of the sale without High Nogal’s involvement. (Id. at 117-18.) In fact, the owner of High Nogal did not even know the particulars of the deal, only the dollar amount. (Id. at 118.) Thus, from my review of the record, I believe Moncor Bank may have had de facto title to the Ranch. See United States v. Hall, 307 F.2d 238, 241 (10th Cir.1962) (stating, in deciding that taxpayer did not realize discharge of indebtedness income, that “[ejourts need not apply mechanical standards which smother the reality of a particular transaction”)[6]; cf. Danenberg v. Commissioner, 73 T.C. 370, 382, 1979 WL 3864 (1979) (finding taxpayer to be seller of collateral where bank controlled final purchase price but owner in all other respects “was active in arranging the disposition of such assets”); Allen v. Courts, 127 F.2d 127, 128 (5th Cir.1942) (stock broker who financed purchase of seat on New York Stock Exchange deemed “in effect” seller of seat). Because the Tax Court did not reach this issue, I would remand for a finding as to who was the actual seller of the Ranch.
In sum, I would AFFIRM the Tax Court’s holding that the contested liability doctrine precludes the Preslars from recognizing discharge of indebtedness income, although I would REMAND for a finding as to whether the Preslars participated in fraud in their deal with Moncor Bank, as unclean hands would prevent them from taking advantage of the equitable doctrine. Alternatively, because the Preslars might be entitled to a purchase-money debt reduction under I.R.C. § 108(e)(5) if Moncor Bank was the true seller of the Ranch, I would REMAND for a finding as to whether the seller of the Ranch in fact was Moncor Bank. For these reasons, I respectfully dissent.

. The majority asserts that the Preslars "offered no evidence the fair market value of the ranch differed from their $1 million purchase price,” and “no expert appraisals at trial to support their inflation of value theory.” Ante at 1330. I do not believe this is correct. Preslar was "an experienced real estate agent” of twenty-five years, as the majority acknowledges, ante at 1325, 1330-31, and Preslar testified that during negotiations with Moncor Bank for the purchase of the Ranch “it [was] conclude[d]" that the fair market value of the Ranch was “considerably less" than $1 million, and that in his own estimate it was "extremely low,” (Tr. at 79).

. The majority discounts Preslar’s testimony as “self-serving” statements regarding the intentions of the parties. Ante at 1330. However, as the cited evidence demonstrates, Preslar’s testimony mostly contains undisputed facts regarding the circumstances of the loan transaction from which inferences of intent can be drawn, rather than "self-serving” statements of intent such as that disapproved of in Philhall Corp. v. United States, 546 F.2d 210, 215 (6th Cir.1976) (where issue was taxpayer's intent in acquiring certain property, discounting taxpayer's testimony that “I thought it was a good investment” as self-serving statement of intent "not supported by objective facts”).

.The majority states that this request by the Preslars “evidences the Preslars' recognition that they had a fixed and certain liability at the time the FDIC took control of their loan from Moncor Bank.” Ante at 1330. This, however, ignores the possibility that the request also could reflect the Preslars’ desire to discount to real dollars the inflated principal on the loan since the FDIC would not accept the inflated medium of repayment originally agreed to by Moncor Bank. This latter inference is consistent with the Tax Court’s decision, and cannot be said to be clearly erroneous.

. The majority reasons that the Preslars had a "fixed and certain liability” when the FDIC took control of the Bank loan in part because "Preslar conceded he understood he was personally liable for the full amount of the $1 million note in the event he could not sell a sufficient number of lots.” Ante at 1330 (emphasis added). It seems to me that this reasoning is flawed. As the emphasized language indicates, Preslar's concession that he was personally liable for the entire $1 million note was premised on his ability to make payments on the loan using the inflated medium of installment sales contracts assigned at significantly above market value. This concession says nothing about Preslar's understanding of his liability on tire note if he was precluded from using the repayment scheme. Indeed, the record indicates otherwise, as the thrust of the Preslars' dispute was that they "wanted the FDIC to substantially discount the remaining amount due on their loan” as an "alternative to [the FDIC] accepting the purchase contracts.” (Stip. #35.)

. The majority does recognize that, in the case of a debt that is unenforceable "as a result of an infirmity at the time of its creation (e.g., fraud or misrepresentation), tax liability may be avoided through a purchase price reduction under 26 U.S.C. § 108(e)(5) or an 'infirmity exception.' ” Ante at 1329. Unenforceability, however, may arise for reasons other than fraud or misrepresentation, see, e.g., Zarin, 916 F.2d at 113 (illegal extension of credit); United States v. Hall, 307 F.2d 238, 241 (10th Cir.1962) (unenforceable gambling debt); N. Sobel, 40 B.T.A. at 1264 (illegal loan and failure to carry out promises to guarantee borrower against loss), and may arise after the creation of the loan but relate back to the circumstances of its origin, such as in this case or, in part, in N. Sobel.

. The majority questions the "continued viability” of Hall in light of Tufts, but Tufts does not put into doubt the “hardly ... exceptional” “idea that ‘Courts need not apply mechanical standards which smother the reality of a particular transaction.’” Zarin, 916 F.2d at 116 n. 11 (quoting Hall, 307 F.2d at 241). Moreover, as discussed supra Part I, Tufts ’ holding on nonre-course loans does not implicate the contested liability doctrine.