**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 16 1999**

**PATRICK FISHER**
**Clerk**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

LAYNE E. PRESLAR and SUE F.
PRESLAR,

Petitioners-Appellees,

v.

COMMISSIONER OF INTERNAL
REVENUE,

Respondent-Appellant.

No. 97-9016

APPEAL FROM THE UNITED STATES TAX COURT
(T.C. No. 0090-1:14051-94)

John A. Dudeck, Jr. (Richard Farber with him on the brief), Tax Division,
Department of Justice, Washington, D.C., for the appellant.

Ron Lewis, Ruidoso, New Mexico, for the appellees.

Before **EBEL** and **BRISCOE**, Circuit Judges, and **MARTEN**, District Judge.[1]

**BRISCOE**, Circuit Judge.

---

[1] The Honorable J. Thomas Marten, United States District Judge for the
District of Kansas, sitting by designation.

The Commissioner of Internal Revenue appeals the United States Tax Court's decision to redetermine the tax deficiency assessed against Layne and Sue Preslar for underpayment of 1989 federal income taxes. The Tax Court held the Preslars' settlement of a loan obligation for less than the face amount of the loan did not create taxable income because the contested liability/disputed debt exception to the general discharge-of-indebtedness income rule rendered the write-off nontaxable. We exercise jurisdiction pursuant to 26 U.S.C. § 7482(a)(1), and reverse and remand.

I.

Layne Preslar, a real estate agent of twenty-five years, commenced negotiations in 1983 to purchase a 2500-acre ranch near Cloudcroft, New Mexico. High Nogal Ranch, Inc., owned the ranch and was a debtor-in-possession in a Chapter 11 bankruptcy proceeding. Citizens State Bank of Carrizozo, Security Bank and Trust of Alamogordo, and Moncor Bank held mortgages in the ranch. Moncor Bank, which had been experiencing serious financial difficulties and whose interest was subordinate to the other banks, took the lead in assisting in negotiations between High Nogal and Preslar. Moncor Bank's actions were designed to avoid foreclosure and recoup as much of its loan as possible.

On July 12, 1983, after six months of talks, Layne and Sue Preslar agreed to purchase the ranch for $1 million, with the sale to be financed by Moncor

-2-

Bank. The agreement expressly referred to the fact that Moncor Bank was financing the purchase, but only the Preslars and the president of High Nogal signed the contract on September 1, 1983. The Preslars executed a $1 million promissory note in favor of Moncor Bank, secured by a mortgage on the ranch. The Preslars were to pay fourteen annual installments of $66,667, with interest at twelve percent per annum, with final payment due September 1, 1998. Moncor Bank used $760,000 of the loan proceeds to satisfy the mortgages of Citizens State Bank and Security Bank and Trust. The Preslars thus received title to the ranch free and clear of all of High Nogal's prior mortgages.

The Preslars intended to develop the ranch as a sportsman's resort by subdividing 160 acres and selling one- to two-acre lots for cabins or vacation homes, and permitting lot owners to hunt and engage in other outdoor recreational activities on the remaining 2,340 acres. The goal was to sell each cabin lot for approximately $16,500, with total gross revenues exceeding $1.5 million. The Preslars' 1989 joint tax return indicates several lots sold for substantially higher amounts.

Moncor Bank permitted the Preslars to repay their loan by assigning the installment sales contracts of purchasers of cabin lots to Moncor Bank at a discount. There is no reference to this unique repayment arrangement in the loan documents. The first written description of this repayment method appears in a

May 3, 1984, letter from Joseph Ferlo, a representative of Moncor Bank, to Layne Preslar. The arrangement is also discussed in an unsigned 1985 "Dealer Agreement" between Moncor Bank and the Preslars. When each cabin lot was sold, the Preslars assigned and physically transferred the written sales contract to Moncor Bank. In return, Moncor Bank credited the Preslars' debt obligation in an amount equal to 95 percent of the stated principal contract price, regardless of actual payments received from the purchaser. Moncor Bank received a security interest in each lot sold to protect its interests in the event a purchaser defaulted. Between September 1983 and August 1985, the Preslars sold nineteen cabin lots and had assigned most of the contracts to Moncor Bank prior to its declared insolvency. Moncor Bank had credited the Preslars' principal loan balance with approximately $200,000. Funds applied to interest are not included in this amount; thus, the aggregate amount of discounted installment contracts assigned to Moncor Bank exceeded $200,000.

In August 1985, Moncor Bank was declared insolvent and the Federal Deposit Insurance Corporation (FDIC) was appointed as receiver. The FDIC notified the Preslars of the insolvency and advised them to make all future payments on their loan to the FDIC. The FDIC refused to accept further assignments of sale contracts as repayment and ordered the Preslars to suspend sales of cabin lots. The Preslars complied with the suspension directive, but made

no further payments on the loan.

The Preslars filed an action against the FDIC for breach of contract in September 1985, seeking an order requiring the FDIC to accept assignment of sales contracts as loan repayment. The parties settled the action in December 1988 after the FDIC agreed to accept $350,000 in full satisfaction of the Preslars' indebtedness. The Preslars borrowed the $350,000 from another bank and, after the funds were remitted to the FDIC, the original $1 million promissory note was marked "paid."

At the time of the settlement, the unpaid balance on the Preslars' loan was $799,463. The Preslars paid a total of $550,537 on the loan ($350,000 settlement plus $200,537 credited for assignment of sales contracts). Therefore, as a result of the settlement, the Preslars' outstanding debt obligation was reduced by $449,463 ($1 million less $550,537).

The Preslars did not include the $449,463 debt write-off as discharge-of-indebtedness income on their 1989 joint tax return. Rather, they opted to reduce their basis in the ranch by $430,000 pursuant to Internal Revenue Code § 108(e)(5), 26 U.S.C. § 108(e)(5). The Preslars' 1989 tax return was audited and they were assessed a deficiency because (1) they had realized $449,463 in discharge-of-indebtedness income, and (2) they were not eligible to treat such income as a purchase price adjustment under § 108(e)(5). A penalty was also

assessed under Internal Revenue Code § 6651(a)(1), 26 U.S.C. § 6651(a)(1), for failure to file a timely return.

The Preslars sought a redetermination of the deficiency in United States Tax Court, insisting they were free to treat their settlement with the FDIC as a purchase price adjustment pursuant to § 108(e)(5) and/or common law. They supported this theory in part by claiming the FDIC's refusal to honor their repayment agreement with Moncor Bank amounted to an infirmity relating back to the original sale, thereby negating the general prohibition against treating debt reductions as purchase price adjustments. They further argued the complicated nature of their return was good cause for not timely filing. At no time, however, did the Preslars dispute their underlying liability on the $1 million note.

The Commissioner responded that the Preslars could not invoke § 108(e)(5) because that provision applies only to situations where the *seller* of property agrees to reduce the amount of the purchaser's debt flowing from the property sale. In this case, the Commissioner argued, the property seller was High Nogal. The party responsible for reducing the Preslars' debt was not the seller but was the FDIC (as receiver for Moncor Bank), thereby rendering § 108(e)(5) inapplicable. The Commissioner also argued the common law purchase price adjustment rule did not survive the adoption of § 108(e)(5). Finally, the Commissioner maintained the Preslars had not demonstrated good cause for the

untimely filing of their 1989 return.

The Tax Court ruled in favor of the Preslars without addressing the purchase price adjustment issue. Instead, the court *sua sponte* invoked the contested liability doctrine and held the Preslars' unusual payment arrangement with Moncor Bank caused their liability for the full $1 million loan to be brought into question. The court determined the true amount of the Preslars' indebtedness was not firmly established until they settled with the FDIC; thus, no discharge-of-indebtedness income could have accrued to the Preslars as a result of the settlement. Although the court held the Preslars' untimely filing was not justified, it reasoned the absence of a tax deficiency negated the penalty assessment. The Preslars do not appeal the determination that their untimely filing was not justified.

## II.

Decisions of the United States Tax Court are reviewed "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury." 26 U.S.C. § 7482(a)(1). We review the Tax Court's factual findings for clear error and its legal conclusions de novo. See Schelble v. Commissioner, 130 F.3d 1388, 1391 (10th Cir. 1997). The Preslars have the burden of proving the Commissioner's determinations are incorrect on factual issues. See id. (citing Tax Ct. R. Prac. & Proc. 142(a); Welch v. Helvering, 290

-7-

U.S. 111, 115 (1933)).  [2]

**Discharge-of-Indebtedness Income**

Section 61(a) of the Internal Revenue Code broadly defines "gross income" as "all income from whatever source derived" except as expressly provided otherwise.  26 U.S.C. § 61(a).  The phrase is intended to capture all "accessions to wealth, clearly realized, and over which the taxpayers have complete dominion."  Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955). From its enactment, the "sweeping scope" of this provision and its statutory predecessors has been consistently emphasized by the Supreme Court.  See Commissioner v. Schleier, 515 U.S. 323, 327-28 (1995);  Glenshaw Glass, 348 U.S. at 429-32 & n.11.

This case centers around the Commissioner's determination of the Preslars' discharge-of-indebtedness income after they settled their loan obligation with the FDIC in December 1988.  The concept of discharge-of-indebtedness income, first articulated in  United States v. Kirby Lumber Co., 284 U.S. 1 (1931), and later

---

[2]  The Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. No. 105-206, § 3001, 112 Stat. 685, 726-27 (1998) (codified at 26 U.S.C. § 7491), popularly known as the "Taxpayer Bill of Rights," shifts the burden of proof to the Commissioner in certain cases where the taxpayer "introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer."  However, this amendment did not become effective until July 22, 1998.

codified in 26 U.S.C. § 61(a)(12), requires taxpayers who have incurred a financial obligation that is later discharged in whole or in part, to recognize as taxable income the extent of the reduction in the obligation. Two rationales have been identified for this rule:

> This rule is based on the premise that the taxpayer has an increase in wealth due to the reduction in valid claims against the taxpayer's assets. In the alternative it has been suggested that taxation is appropriate because the consideration received by a taxpayer in exchange for [his] indebtedness is not included in income when received because of the obligation to repay and the cancellation of that obligation removes the reason for the original exclusion.

2 Jacob Mertens, Jr., Mertens Law of Federal Income Taxation § 11.01 (1996). Loans ordinarily are not taxable because the borrower has assumed an obligation to repay the debt in full at some future date. See Commissioner v. Tufts, 461 U.S. 300, 307 (1983). Discharge-of-indebtedness principles come into play, however, if that assumption of repayment proves erroneous. Otherwise, taxpayers could secure income with no resulting tax liability.

It is undisputed that the Preslars financed their purchase of the ranch in 1983 by executing a $1 million promissory note in favor of Moncor Bank. It is similarly uncontested that when the Preslars settled their lawsuit with the FDIC in 1988, thereby extinguishing all obligations arising from the 1983 loan, only $550,537 had been paid on the loan principal. Nevertheless, the Tax Court ruled the Preslars' underlying debt was disputed and fell within the judicially-created

"contested liability" exception to discharge-of-indebtedness income.

**Contested Liability/Disputed Debt Exception**

The "contested liability" or, as it is occasionally known, "disputed debt" doctrine rests on the premise that if a taxpayer disputes the *original amount* of a debt in good faith, a subsequent settlement of that dispute is "treated as the amount of debt cognizable for tax purposes." Zarin v. Commissioner, 916 F.2d 110, 115 (3d Cir. 1990). In other words, the "excess of the original debt over the amount determined to have been due" may be disregarded in calculating gross income. Id. The few decisions that have interpreted this doctrine have generated considerable controversy.

The origins of the contested liability doctrine can be traced to N. Sobel, Inc. v. Commissioner, 40 B.T.A. 1263 (1939), a case arising during the Great Depression. In that case, a New York corporation purchased 100 shares of a bank's stock and signed a $21,700 note as payment. When the note matured, the stock was worthless. The corporation sued the bank for rescission, insisting the loan contravened state law and the bank had failed to fulfill its promise to guarantee the corporation against loss. Shortly thereafter, the state superintendent of banks closed the bank because of insolvency and initiated a countersuit against the corporation for the amount of the note. The parties ultimately settled the

consolidated proceedings with the corporation paying the superintendent $10,850 in return for discharge of the debt. The corporation then took a $10,850 deduction in the year of settlement. The Commissioner disallowed the deduction and assessed a $10,850 deficiency, representing the amount of the original loan over the settlement figure. The Board of Tax Appeals reversed the ruling and upheld the deduction, concluding the corporation's ownership of the shares and the degree of liability on the note were highly unclear. See id. at 1265 ("There is question whether the taxpayer bought property in 1929 and question as to its liability *and the amount thereof*.") (emphasis added). The Board found the corporation's financial obligations could not be assessed definitively prior to resolution of its dispute with the superintendent and, since settlement compromised the parties' claims and precluded recognition of their legal rights, the existence and amount of the corporation liability were not fixed until the date of settlement. Thus, release of the note did not amount to a gain for the corporation.

In Zarin, the court embraced the reasoning of N. Sobel while reversing the Commissioner's recognition of discharge-of-indebtedness income. The state gaming commission identified Zarin as a compulsive gambler and ordered an Atlantic City casino to refrain from issuing him additional credit, but the casino ignored the commission. When Zarin's debt surpassed $3.4 million, the casino

filed a state action to collect the funds. Zarin initially denied liability on the grounds the casino's claim was unenforceable under New Jersey law. The parties later settled the dispute for $500,000. After Zarin failed to account for the debt write-off on his tax return, the Commissioner assessed a deficiency for approximately $2.9 million, the amount by which Zarin's underlying debt exceeded his settlement with the casino. The Tax Court affirmed. However, a divided Third Circuit held Zarin had no discharge-of-indebtedness income because, *inter alia*, his transaction with the casino arose from a contested liability. 916 F.2d at 115-16. Citing no authority, the majority reasoned that "[w]hen a debt is unenforceable, it follows that the amount of the debt, and not just the liability thereon, is in dispute." Id. at 116. Therefore, the $500,000 settlement "fixed the amount of loss and the amount of debt cognizable for tax purposes." Id.

The problem with the Third Circuit's holding is it treats liquidated and unliquidated debts alike. The whole theory behind requiring that the *amount* of a debt be disputed before the contested liability exception can be triggered is that only in the context of disputed debts is the Internal Revenue Service (IRS) unaware of the exact consideration initially exchanged in a transaction. See Daniel Shaviro, The Man Who Lost Too Much: Zarin v. Commissioner and the Measurement of Taxable Consumption, 45 Tax L. Rev. 215, 256 (1990). The

-12-

mere fact that a taxpayer challenges the enforceability of a debt in good faith does not necessarily mean he or she is shielded from discharge-of-indebtedness income upon resolution of the dispute. To implicate the contested liability doctrine, the original amount of the debt must be unliquidated. A total denial of liability is not a dispute touching upon the amount of the underlying debt. [3] One commentator has observed:

> Enforceability of the debt . . . should not affect the tax treatment of the transaction. If the parties initially treated the transaction as a loan when the loan proceeds were received, thereby not declaring the receipt as income, then the transaction should be treated consistently when the loan is discharged and income should be declared in the amount of the discharge.

Gregory M. Giangiordano, Taxation-Discharge of Indebtedness Income-Zarin v. Commissioner, 64 Temp. L. Rev. 1189, 1202 n.88 (1991). A holding to the contrary would strain IRS treatment of unenforceable debts and, in large part, disavow the Supreme Court's mandate that the phrase "gross income" be

---

[3] Although Professors Bittker and McMahon correctly state in their treatise that the contested liability rule requires a valid dispute by a debtor of the amount owed to a creditor, they misapply the doctrine in their hypothetical. See Boris I. Bittker and Martin J. McMahon, Jr., Federal Income Taxation of Individuals ¶ 4.5[3][c] (2d ed. 1995). In their example, an individual buys business equipment for $1,000 on credit but then refuses to pay because of an alleged misrepresentation or breach of warranty. The parties later settle for $750. The professors assert the $250 debt reduction is not taxable. We agree. The basis for the exclusion, however, is not the contested liability doctrine. There is no dispute over the $1,000 purchase price figure upon which the parties originally agreed. Taxable income avoidance flows from the purchase price adjustment rule or "infirmity exception." See discussion at pages 20-25.

interpreted as broadly as the Constitution permits.    See Glenshaw Glass , 348 U.S. at 432 & n.11.

This conclusion is underscored by the Supreme Court's holding in     Tufts that a nonrecourse mortgage (i.e., taxpayer has no personal liability upon default) must be treated as an enforceable loan both when it is made and when it is discharged.  461 U.S. at 311-13.  The Court reasoned that because the indebtedness is treated as a true debt when it is incurred, it must be treated as a true debt when it is discharged, with all the attendant tax consequences.    Id. at 309-10.  It seems evident from this ruling that if the distinction between the recourse and nonrecourse nature of a loan has no bearing on calculation of gross income, the enforceability of a debt should be of equally minimal importance.    Of course, if the debt is unenforceable as a result of an infirmity at the time of its creation (e.g., fraud or misrepresentation), tax liability may be avoided through a purchase price reduction under 26 U.S.C. § 108(e)(5) or an "infirmity exception."

The Tax Court in this case and the court in     Zarin cited United States v. Hall, 307 F.2d 238 (10th Cir. 1962), in support of their contested liability holdings.  In Hall, the taxpayer incurred gambling losses at a Las Vegas club in an estimated range of $145,000 to $478,000.  One of the owners of the club agreed to forgive the debt in return for a one-half interest in the taxpayer's cattle. Just prior to transfer of the interest in the cattle, which had a base value of

-14-

$148,110, the parties mutually agreed to assess the taxpayer's losses at $150,000. The Commissioner sought to assess the taxpayer with $1,890 as discharge-of-indebtedness income. Without raising the contested liability doctrine, we rejected the Commissioner's position and held "a gambling debt, being unenforceable in every state, has but slight potential and does not meet the requirements of debt necessary to justify the mechanical operation of general rules of tax law relating to cancellation of debt." Id. at 241.

Whether Hall has continued viability is questionable in light of the Supreme Court's holding in Tufts. The emphasis on a taxpayer's lack of legal obligation to pay a gambling debt in Hall is difficult to reconcile with Tuft's disregard of the nonrecourse nature of a loan in calculating gross income. Even if parts of Hall remain viable, however, the opinion would offer little refuge to the Preslars. The debt in Hall was unliquidated. The taxpayer's underlying obligation, therefore, could not be assessed prior to settlement with the club owner. Such a scenario is not present here.

In this case, the Tax Court observed that "the unusual payment arrangement between [the Preslars] and Moncor Bank relating to the Bank loan casts significant doubt on [the Preslars'] liability for the total $1 million stated principal amount of the Bank loan." Tax Ct. Op. at 8. Accepting the Preslars' contention that their $1 million purchase price had been inflated and did not

-15-

reflect the fair market value of the ranch, the Tax Court suggested the Preslars had agreed to the terms of the financing arrangement only after Moncor Bank assented to a favorable repayment scheme involving assignment of installment sales contracts. The court held when the FDIC refused to honor this payment arrangement, "a legitimate dispute arose regarding the nature and amount of [the Preslars'] liability on the Bank loan." Id. Only after the Preslars and the FDIC settled their subsequent lawsuit, the court reasoned, was the amount of liability on the loan finally established.

It is conceivable that two parties could negotiate a loan transaction in which the underlying amount of a debt is tied to the existence or nonexistence of some post-execution event. Indeed, the IRS has defined "indebtedness" as "an obligation, absolute and not contingent, to pay on demand or within a given time, in cash or another medium, a fixed amount." Treas. Reg. § 1.108(b)-1(c), 26 C.F.R. § 1.108(b)-1(c) (1998). [4] Contrary to the Tax Court's representations, however, there is no evidence of such an agreement here.

---

[4] The terms of this regulation have not changed since it was first adopted in 1960. See 25 Fed. Reg. 11402, 11496 (1960). Although the regulation's specific focus is on discharge-of-indebtedness of railroad corporations and does not explicitly apply to the term "indebtedness" under Internal Revenue Code § 61(a)(12), the regulatory language is equally applicable to § 61(a)(12). See Boris I. Bittker and Barton H. Thompson, Jr., Income from the Discharge of Indebtedness: The Progeny of United States v. Kirby Lumber Co. , 66 Cal. L. Rev. 1159, 1169 (1978).

The Preslars advanced no competent evidence to support their theory that their loan obligation was linked to the repayment scheme. They maintain that, although they did not state it in writing, their acquiescence in the $1 million purchase price hinged on their being able to satisfy the debt through assignment of installment contracts. Thus, when the FDIC refused to honor the assignments, a concomitant reduction in their liability was necessary. In other words, the "FDIC could not enforce the ranch loan without abiding by the [unsigned] Dealer Agreement. The loan and the Dealer Agreement were two sides of an integrated transaction." Appellees' Br. at 4-5. Neither the May 1984 letter from Moncor Bank to Layne Preslar nor the unsigned 1985 Dealer Agreement, however, contains any statement evincing an intent to link the underlying liability with the repayment scheme. Further, if the parties desired the loan obligation to be inextricably intertwined with the repayment arrangement, that condition should have been memorialized in the loan document and not merely set out in a letter eight months after the loan was formalized. The dissent's protestations notwithstanding, Layne Preslar's own self-serving testimony regarding the intentions of the parties to the original loan agreement is not sufficient to support the Preslars' integrated transaction theory. See Philhall Corp. v. United States, 546 F.2d 210, 215 (6th Cir. 1976) ("[T]he testimony of [a] taxpayer as to intent, standing alone and unsupported by objective facts, [is] insufficient as a matter of

law."); Nasser v. United States, 257 F. Supp. 443, 447 (N.D. Cal. 1966) (same).

In addition, the Preslars' characterization of their dispute with the FDIC as the culmination of their dispute over the ranch loan is not faithful to the evidence. The dispute with the FDIC focused only on the terms of repayment; it did not touch upon the amount or validity of the Preslars' debt. See Stipulation of Facts at ¶ 36. This conclusion is highlighted by the relief sought from the FDIC. As an alternative to accepting assignment of contracts, the Preslars requested that the FDIC "substantially discount the remaining amount due on their loan." Id. Such a position evidences the Preslars' recognition that they had a fixed and certain liability at the time the FDIC took control of their loan from Moncor Bank. In fact, Layne Preslar conceded he understood he was personally liable for the full amount of the $1 million note in the event he could not sell a sufficient number of lots. In sum, the Preslars' underlying indebtedness remained liquidated at all times.

Although ultimately irrelevant, the Preslars offered no evidence, other than Layne Preslar's self-serving testimony, that the fair market value of the ranch differed from their $1 million purchase price. They introduced no expert appraisals at trial to support their inflation of value theory. The only references in the record to appraisals are those allegedly conducted immediately prior to the settlement with the FDIC. However, the alleged appraisals were not admitted at

-18-

trial. The Preslars suggest an August 31, 1983, transcript of judgment in the amount of $495,957 unencumbering Moncor Bank's lien on the ranch reflects the true value of the property. This document, however, is merely one of a series of judgment transcripts filed releasing liens on the ranch. Indeed, two other banks held outstanding prior mortgages on the ranch totaling approximately $760,000. The court cannot extrapolate the value of property from a single creditor's two-year-old judgment. Moreover, even if the Preslars could demonstrate the property was worth less than the purchase price, they still could not invoke the contested liability doctrine in the absence of proof the loan they executed was tainted by fraud or material misrepresentations, because the underlying amount of their debt obligation remained liquidated. Cf. Commissioner v. Sherman, 135 F.2d 68, 70 (6th Cir. 1943) (settlement following taxpayer's contest of duty to repay full amount of mortgage based on misrepresentations at time of contracting did not leave taxpayer with discharge-of-indebtedness income). There are no allegations of fraud or misrepresentation in this case.

Finally, the Preslars contend their transaction with Moncor Bank made little economic sense and was done only to accommodate Moncor Bank in its attempts to pacify bank regulators. This argument has little merit. It is highly doubtful that an experienced real estate agent like Layne Preslar would spend six months negotiating the price of the ranch only to then agree to a grossly overstated figure.

Even more incredible is the notion that the Preslars would have exposed themselves to $1 million of personal liability out of pure benevolence for the bank. As the Commissioner points out, if the Preslars had sold all ninety-six lots for $16,500 as they claimed they could during loan negotiations with Moncor Bank, they would have netted a gross profit of more than $300,000. Moncor Bank fully expected the Preslars to be successful in their sales of lots and anticipated profits. The deal that the Preslars brokered with Moncor Bank made total economic sense. The Tax Court's invocation of the contested liability doctrine in the face of the record presented was unwarranted.

**Purchase Price Adjustment**

Another method by which taxpayers can avoid discharge-of-indebtedness income is to classify their debt reductions as purchase price adjustments. This rule permits taxpayers to reflect their debt reduction by adjusting the basis of their property rather than recognizing an immediate gain as cancellation of indebtedness. Although this principle had been part of the common law for decades, Congress codified the rule as part of the Bankruptcy Tax Act of 1980, Pub. L. No. 96-589, § 2(a), 94 Stat. 3389, 3389-90 (1980) (codified at 26 U.S.C. § 108(e)(5)). The statute now provides:

> If--
> (A) the debt of a purchaser of property to the seller of

such property which arose out of the purchase of such property is reduced,
(B) such reduction does not occur --
      (i) in a title 11 case, or
      (ii) when the purchaser is insolvent, and
(C) but for this paragraph, such reduction would be treated as income to the purchaser from the discharge of indebtedness,
then such reduction shall be treated as a purchase price adjustment.

26 U.S.C. § 108(e)(5) (1988).

The Preslars cannot treat their settlement with the FDIC as a purchase price reduction. Section 108(e)(5) applies only to direct agreements between a purchaser and seller. S. Rep. No. 96-1035 at 16 (1980), *reprinted in* 1980 U.S.C.C.A.N. 7017, 7031. "If the debt has been transferred by the seller to a third party (whether or not related to the seller), or if the property has been transferred by the buyer to a third party (whether or not related to the buyer)," the purchase price reduction exception is not available and normal discharge-of-indebtedness rules control. Id.; see 2 Mertens Law of Federal Income Taxation §§ 11.20, 11.25. The seller in this case was High Nogal. Although Moncor Bank helped negotiate the terms of the sale, it did so only in its capacity as a mortgage holder. The Preslars make much of the fact that one of the signatories to the "Sellers Statement" memorializing the sale was a Moncor Bank representative. However, the vice-president of Moncor Bank testified the bank signed the document at the insistence of the title companies. As neither Moncor Bank nor its

-21-

receiver, the FDIC, was the seller of the property, the loan settlement the Preslars negotiated with the FDIC does not permit them to invoke the debt reduction as a purchase price adjustment under § 108(e)(5). [5]

The Preslars seek to avoid the requirements of § 108(e)(5) by arguing the transaction is embraced by: (1) a "seller financing" exception; (2) the common law purchase price reduction doctrine; or (3) a third-party transfer exception in cases of infirmities relating back to the original transaction. We address each theory in turn.

*Seller Financing Exception* -- Citing Danenberg v. Commissioner, 73 T.C. 370 (1979), the Preslars contend a party financing the sale of property may be treated as the seller for purposes of § 108(e)(5). The Preslars misconstrue Danenberg. Danenberg involved two insolvent taxpayers attempting to sell property previously pledged as collateral on a bank loan. All negotiations were subject to approval by the bank. The taxpayers agreed on a purchase price with several of their creditors and obtained the bank's approval. The Commissioner assessed a deficiency based on failure to account for long-term gains from the sale. The issue before the Tax Court centered not on discharge-of-indebtedness

---

[5] Contrary to the dissent's argument, the minimal participation of High Nogal officials in the negotiations culminating in the Preslars' purchase of the ranch is of little or no relevance in assessing ownership interests in the ranch. There is not a scintilla of evidence in the record that title passed from High Nogal to Moncor Bank at any time prior to the Preslars' purchase.

income but on whether the taxpayers were required to recognize gain from the sale of property pursuant to 26 U.S.C. § 1002. [6] The Tax Court determined a gain had to be recognized because the taxpayers were the sellers of the property. Only after the sale had been consummated did a "second transaction" occur in which the proceeds were paid to the bank and used to reduce taxpayers' indebtedness. The instant action involves neither insolvent taxpayers nor treatment of gain or loss on disposition of property. If anything, Danenberg supports the Commissioner's contention that High Nogal and not Moncor Bank was the seller.

*Common Law Purchase Price Reduction Doctrine --* The Preslars insist the common law purchase price reduction doctrine may be invoked in cases where 26 U.S.C. § 108(e)(5) is inapplicable. The Commissioner responds that § 108(e)(5) has displaced the common law on this issue and, in any event, a debt reduction by a third-party lender was not considered a purchase price adjustment under common law. See Fifth Ave.-Fourteenth Ct. Corp. v. Commissioner, 147 F.2d 453, 456-57 (2d Cir. 1944) (doctrine does not apply where reduction results from arms-length transaction relating solely to debt itself).

It is clear the case law developed prior to enactment of § 108(e)(5) did not extend the purchase price reduction exception to debt settlements outside the

_____

[6] This section was later repealed and its relevant provisions were inserted in 26 U.S.C. § 1001 pursuant to the Tax Reform Act of 1976, Pub. L. No. 94-455, § 1901(b)(28)(B)(i), 90 Stat. 1520, 1799 (1976).

purchase money mortgage context. 2 Mertens Law of Federal Income Taxation §

11.25. The case law was not consistent, however, with respect to purchase money

mortgages involving third parties. Compare Fifth Ave., 147 F.2d at 456-57

(doctrine does not apply to third-party transactions), with Hirsch v.

Commissioner, 115 F.2d 656, 657-59 (7th Cir. 1940) (doctrine does apply to

third-party transactions).

The Hirsch case relied on Bowers v. Kerbaugh-Empire Co., 271 U.S. 170

(1926), a decision implicitly repudiated in subsequent years. See Glenshaw

Glass, 348 U.S. at 429-32 & n.11; Kirby Lumber, 284 U.S. at 2. Further, §

108(e)(5) was intended, at least in part, to create uniformity in this jurisprudence.

See S. Rep. No. 96-1035 at 16-17 (1980), reprinted in 1980 U.S.C.C.A.N. 7017,

7031-32 ("This provision is intended to eliminate disagreements between the

Internal Revenue Service and the debtor as to whether, in a particular case to

which the provision applies, the debt reduction should be treated as discharge

income or a true price adjustment."). If, as the Preslars argue, the common law

rule remains viable and permits taxpayers involved in third-party transactions to

treat their debt reductions as purchase price adjustments rather than additions to

their gross income, § 108(e)(5) would be rendered meaningless. We agree with

the Commissioner's rationale for imposing the direct seller-purchaser negotiation

requirement, as articulated in a 1992 revenue ruling:

> An agreement to reduce a debt between a purchaser and a third-party lender is not a true adjustment of the purchase price paid for the property because the seller has received the entire purchase price from the purchaser and is not a party to the debt reduction agreement. The debt reduction relates solely to the debt and results in discharge of indebtedness income to the debtor.

Rev. Rul. 92-99, 1992-2 C.B. 35. Accordingly, the Preslars may not treat their settlement with the FDIC as a common law purchase price reduction.

*Infirmity Exception* -- The Preslars argue they qualify for the limited "infirmity exception" to the general prohibition against treating debt reductions as purchase price adjustments in other than direct seller-purchaser transactions. Under this narrow exception, taxpayers may treat debt reductions negotiated with third parties as purchase price adjustments "to the extent that the debt reduction by the third-party lender is based on an infirmity that clearly relates back to the original sale (e.g., the seller's inducement of a higher purchase price by misrepresentation of material fact or by fraud)." Rev. Rul. 92-99. As noted, the Preslars have made no allegations of misrepresentation or fraud. The "infirmity" upon which they predicate their theory is the FDIC's refusal to abide by terms of the repayment plan negotiated with Moncor Bank. However, that dispute did not relate back to the original sale; thus, the "infirmity exception" is inapplicable.

## III.

We REVERSE the Tax Court's vacatur of the Commissioner's determination of tax deficiency and imposition of untimely filing penalties and

REMAND the case with instructions to enter judgment in favor of the

Commissioner.

97-9016, Preslar v. Commissioner

**EBEL, Circuit Judge, dissenting**

I respectfully dissent on two independent grounds. First, the record supports—particularly under the clearly erroneous standard—the Tax Court's factual finding that, "[w]hen the FDIC refused to honor [the] payment arrangement with regard to the Bank loan, a legitimate dispute arose regarding the nature and amount of [the Preslars'] liability on the Bank loan." Tax Ct. Op. at 8. This factual finding properly triggers the contested liability doctrine. Second, the Preslars have a potential argument that they are entitled to a purchase-money debt reduction under Internal Revenue Code ("I.R.C.") § 108(e)(5), 26 U.S.C. § 108(e)(5), as Moncor Bank could be viewed, for all substantive purposes, as the seller of the Ranch. On the first ground, I would affirm. Alternatively, if we do not affirm on the first ground, I would, at the least, remand on the second ground for a finding of fact as to whether Moncor Bank could be considered the seller of the Ranch.

## I. Contested Liability

Under the contested liability doctrine or disputed debt exception, when "there is a legitimate dispute between a creditor and a debtor concerning        the existence of a liability   , and a compromise between the parties is reached, no

discharge of indebtedness income will arise as to the contested and unpaid portion of the original liability." 2 Mertens, Law of Federal Income Taxation , § 11.19 at 42 (1996) (citing Zarin v. Commissioner , 916 F.2d 110 (3d Cir. 1990); N. Sobel, Inc. , 40 B.T.A. 1263 (1939)) (emphasis added). Thus, contrary to the majority's view, the contested liability doctrine is not limited to instances where the taxpayer specifically disputes only the amount of the debt and the original amount was unliquidated .

Indeed, the facts of N. Sobel , the seminal contested liability case, belie the majority's position. There, the taxpayer corporation issued a $21,700 note to pay for 100 shares of a bank's stock. See N. Sobel , 40 B.T.A. at 1264. When the note became due, the corporation refused to pay, disputing not the amount of the note but rather the validity of the note itself "on the ground that the bank made the loan in violation of law and failed to carry out promises to guarantee the [corporation] against loss." Id. The corporation and the bank settled the dispute for $10,850. The Board of Tax Appeals found no discharge of indebtedness income, even though the corporation did not dispute the amount of the debt and even though the original amount was liquidated (at $21,700). Id. at 1265. The Board held that the amount of the corporation's liability was "not actual and present" until the corporation's subsequent compromise agreement with the bank. Id. at 1265.

Given N. Sobel, I believe that the majority's view that the contested liability doctrine applies only when the original amount of a debt is disputed and unliquidated is mistakenly narrow. This view ignores the fact that the original amount of a debt is necessarily disputed and may be unliquidated under a good faith dispute over liability "that can be traced to the circumstances in existence at the time of the debt's creation." William R. Culp, Jr., and Richard E. Marsh, Jr., Avoiding Cancellation of Debt Income Where the Liability is Disputed, 74 J. Tax'n 288, 292 (1991); see Zarin, 916 F.2d at 116 ("When a debt is unenforceable, it follows that the amount of the debt, and not just the liability thereon, is in dispute."); cf. N. Sobel, 40 B.T.A. at 1265 (finding corporation's liability was not "definitely fixed" until settlement of its bona fide dispute regarding validity of note). Only upon resolution of the dispute over the existence of liability traceable to the origin of the debt does the "question as to [the taxpayer's] liability and the amount thereof" become "actual and present by any practical purpose," including taxation. N. Sobel, 40 B.T.A. at 1265. Thus, settlement of a dispute over the enforceability of a debt traceable to its origin, such as the settlements in N. Sobel and Zarin, does not result in a windfall. Such settlements merely establish the original amount of liability, as opposed to discharging any amount of the original liability.

In this case, the Tax Court made a finding of fact that the Preslars disputed

with the FDIC both the nature and amount of their liability on the loan from Moncor Bank. As the majority acknowledges, the Tax Court accepted the Preslars' contention that the $1 million purchase price for the Ranch had been inflated and that the Preslars and Moncor Bank had agreed to a correspondingly inflated method of repayment involving the assignment of installment sales contracts. See Tax Ct. Op. at 4, 7-8. According to the Tax Court, "[w]hen the FDIC refused to honor this payment arrangement with regard to the Bank loan, a legitimate dispute arose regarding the nature and amount of [the Preslars'] liability on the Bank loan." Id. at 8. Thus, given the proper scope of the contested liability doctrine, I believe that the Preslars' settlement with the FDIC would not result in discharge of indebtedness income if the Tax Court's finding is correct.

The majority rejects the Tax Court's finding, stating that "[t]he Preslars advanced no competent evidence to support their theory that their loan obligation was linked to the repayment scheme," such that the FDIC's refusal to abide by the scheme of inflated repayment would give rise to a dispute regarding the inflated principal of the loan. Ante at 17. However, in arriving at this conclusion, the majority overlooks significant evidence in the record as well as the high standard of clear error for overturning the Tax Court's factual finding. See 26 U.S.C. § 7482(a)(1) (circuit courts review Tax Court decisions "in the same manner and to

-4-

the same extent as decisions of the district courts in civil actions tried without a jury"); Exxon Corp. v. Gann, 21 F.3d 1002, 1005 (10th Cir. 1994) (viewing the evidence "in the light most favorable to the district court's ruling," we "must accept the district court's findings of fact unless clearly erroneous," that is, unless "on the entire evidence [we are] left with the definite and firm conviction that a mistake has been committed.") (citations and quotations omitted).

Under the clear error standard, I believe we must affirm the Tax Court's finding. The record contains ample evidence upon which the Tax Court could have concluded that the Preslars disputed the initial nature and amount of their liability on the Bank loan. Specifically, the record contains evidence that: (1) during negotiations for the Ranch, Layne Preslar ("Preslar"), an experienced real estate broker, and the Bank had concluded that the fair market value of the Ranch was considerably less than $1 million, (Tr. at 79)[1]; (2) the Bank nevertheless reassured Preslar that the deal for the Ranch would work if Preslar could make the sales of the cabin lots, (Tr. at 79-80); (3) the terms of the deal for the Ranch

---

[1]The majority asserts that the Preslars "offered no evidence the fair market value of the ranch differed from their $1 million purchase price," and "no expert appraisals at trial to support their inflation of value theory." Ante at 18. I do not believe this is correct. Preslar was "an experienced real estate agent" of twenty-five years, as the majority acknowledges, ante at 2, 19, and Preslar testified that during negotiations with Moncor Bank for the purchase of the Ranch "it [was] conclude[d]" that the fair market value of the Ranch was "considerably less" than $1 million, and that in his own estimate it was "extremely low," (Tr. at 79).

included the Bank purchasing the installment sales contracts of the cabin lots at 95 percent face value under the Dealer Agreement, (Tr. at 80); (4) the standard percentage for the purchase of such contracts was 35 percent, (Tr. at 110); (5) the Preslars purchased the Ranch in 1983 at the $1 million price based upon the Bank's agreement to accept the assignment of installment sales contracts as payment, (Tr. at 82); (6) from the first sale of cabin lots in 1984 until Moncor Bank's bankruptcy in 1985, Preslar sold 19 cabin lots and assigned all the installment sales contracts received from purchasers to the Bank, (Tr. at 85, 93); (7) when the FDIC became the receiver of the Bank, it refused to accept further assignments of these installment sales contracts as payment, (Stip. # 34); (8) that, in the alternative to accepting the assignments as payment, the Preslars wanted the FDIC to discount substantially the remaining amount due on the Bank Loan, (Stip. # 35); (9) during settlement agreements with the FDIC, the value of the Ranch was appraised at $550,000 by a bank financing the Preslars' settlement, (Tr. at 98); (10) Preslar settled his loan with the FDIC for a $350,000 payment, (Stip. # 39); and (11) the total amount the Preslars ended up paying for the Ranch was $550,537 (the $350,000 settlement payment plus $200,537 in installment payments previously received by the Bank) (Stip. # 40).

From the above evidence, taken from Preslar's testimony at trial and the

Stipulation of Facts agreed to by both parties,[2] the Tax Court could permissibly conclude that "a legitimate dispute arose regarding the nature and amount" of the Preslars' liability on the Bank loan once the FDIC refused to accept what the Preslars argued were the original terms allowing him to make payment by assigning installment sales contracts. The evidence would allow the Tax Court to infer that the purchase price of the Ranch was inflated; that the Preslars nevertheless agreed to the Ranch deal, even though the Bank insisted on an inflated purchase price, because they wanted the deal to go through and the Bank agreed to an inflated method of repayment; that the Preslars disputed the nature and amount of their liability on the loan when they requested the FDIC to discount the remaining balance if it would not accept further assignments of sales contracts as payment[3]; and that this dispute is traceable to the origins of the loan.

_____

[2]The majority discounts Preslar's testimony as "self-serving" statements regarding the intentions of the parties. Ante at 18. However, as the cited evidence demonstrates, Preslar's testimony mostly contains undisputed facts regarding the circumstances of the loan transaction from which inferences of intent can be drawn, rather than "self-serving" statements of intent such as that disapproved of in Philhall Corp. v. United States, 546 F.2d 210, 215 (6th Cir. 1976) (where issue was taxpayer's intent in acquiring certain property, discounting taxpayer's testimony that "I thought it was a good investment" as self-serving statement of intent "not supported by objective facts").

[3]The majority states that this request by the Preslars "evidences the Preslars' recognition that they had a fixed and certain liability at the time the FDIC took control of their loan from Moncor Bank." Ante at 19. This, however, ignores the possibility that the request also could reflect the Preslars' desire to discount to real dollars the inflated principal on the loan since the FDIC would

(continued...)

Additionally, the fact that the total amount the Preslars ended up paying for the Ranch ($550,537) approximated the appraised value of the Ranch at the time of settlement negotiations with the FDIC ($550,000) gives further evidentiary support to the Tax Court's conclusion that the Preslars disputed the nature and amount of their liability: once deprived of the inflated medium of repayment for a loan based upon an inflated purchase price, the Preslars settled for an uninflated repayment sum approximately equal to an uninflated purchase price.[4]

Thus, because the evidence, viewed "in the light most favorable" to the Tax Court's ruling, does not leave me "with the definite and firm conviction that a mistake has been committed," Exxon, 21 F.3d at 1005, I do not believe that the

_____

[3](...continued)
not accept the inflated medium of repayment originally agreed to by Moncor Bank. This latter inference is consistent with the Tax Court's decision, and cannot be said to be clearly erroneous.

[4]The majority reasons that the Preslars had a "fixed and certain liability" when the FDIC took control of the Bank loan in part because "Preslar conceded he understood he was personally liable for the full amount of the $1 million note in the event he could not sell a sufficient number of lots." Ante at 19 (emphasis added). It seems to me that this reasoning is flawed. As the emphasized language indicates, Preslar's concession that he was personally liable for the entire $1 million note was premised on his ability to make payments on the loan using the inflated medium of installment sales contracts assigned at significantly above market value. This concession says nothing about Preslar's understanding of his liability on the note if he was precluded from using the repayment scheme. Indeed, the record indicates otherwise, as the thrust of the Preslars' dispute was that they "wanted the FDIC to substantially discount the remaining amount due on their loan" as an "alternative to [the FDIC] accepting the purchase contracts." (Stip. # 35.)

-8-

Tax Court's finding that the Preslars disputed the nature and amount of their debt is clearly erroneous. Accordingly, I would affirm that finding. As a result, I would also affirm the district court's conclusion that the contested liability doctrine precludes settlement of that dispute from generating discharge of indebtedness income.

Such affirmance, however, should be subject to a caveat. Lurking beneath the Preslars' contention that both the purchase price and the medium of repayment were inflated is the possibility that the Preslars aided Moncor Bank in the commission of fraud. The Preslars explain that the "[t]he purchase price financing of Moncor bank was nothing more than an attempt to pacify bank regulators," because the inflated price would allow Moncor bank "to perpetrate a fiction that a nonperforming loan was satisfied." (Aplee. Br. at 3.) Because the contested liability exception is an equitable doctrine, unclean hands on the part of the Preslars would preclude them from taking advantage of it. See Hocker v. New Hampshire Ins. Co., 922 F.2d 1476, 1486 (10th Cir. 1991). Thus, even with an affirmance, I would remand for a determination of the Preslars' role in the deception perpetrated against bank regulators. If the Preslars were involved in fraud, I would not allow them the benefit of the contested liability doctrine.

Two additional points in the majority's discussion of the contested liability doctrine merit comment. First, the majority relies on Commissioner v. Tufts, 461

U.S. 300 (1983), which held that cancellation of a nonrecourse loan realizes discharge of indebtedness income. See id. at 311-13 (1983). The majority believes that this "underscore[s]" its own holding that cancellation of an unenforceable debt realizes discharge of indebtedness income, stating that "if the distinction between the recourse and nonrecourse nature of a loan has no bearing on calculation of gross income, the enforceability of a debt should be of equally minimal importance." Ante at 14-15 .[5] Although unstated, the only way Tufts' holding "underscores" the majority's holding is if a nonrecourse loan is treated as the functional equivalent of an unenforceable debt.

To the extent the majority relies on this premise, I disagree. Nonrecourse loans and unenforceable debts are not functional equivalents. Nonrecourse loans are enforceable, unenforceable debts are not. A party may sue to collect on a nonrecourse loan, but cannot sue to collect on an unenforceable debt. While a taxpayer has no personal liability upon default of a nonrecourse loan, the taxpayer

---

[5]The majority does recognize that, in the case of a debt that is unenforceable "as a result of an infirmity at the time of its creation (e.g., fraud or misrepresentation), tax liability may be avoided through a purchase price reduction under 26 U.S.C. § 108(e)(5) or an 'infirmity exception.'" Ante at 15. Unenforceability, however, may arise for reasons other than fraud or misrepresentation, see, e.g. , Zarin , 916 F.2d at 113 (illegal extension of credit); United States v. Hall , 307 F.2d 238, 241 (10th Cir. 1962) (unenforceable gambling debt); N. Sobel , 40 B.T.A. at 1264 (illegal loan and failure to carry out promises to guarantee borrower against loss), and may arise after the creation of the loan but relate back to the circumstances of its origin, such as in this case or, in part, in N. Sobel .

-10-

nonetheless is always liable for the loan. That liability merely is capped by the value of the underlying security interest. See Michael J. Graetz & Deborah H. Schenk, Federal Income Taxation 194 (3d ed. 1995). Given an unenforceable debt, the taxpayer has no liability. This distinction can make all the difference for tax purposes.

For example, Tufts held that a nonrecourse mortgage, like a recourse mortgage, must be treated as a true loan for tax purposes, so that a disposition of secured property where the buyer assumes the nonrecourse mortgage would result in a realization by the seller of the full unpaid balance of the mortgage, even if the value of the secured property is less than that of the unpaid balance. See 461 U.S. at 311-13; see also Marvin A. Chirelstein, Federal Income Taxation 291-92 (1997) (discussing Tufts). In so holding, the Supreme Court reasoned that "[t]he only difference between [a nonrecourse] mortgage and one on which the borrower is personally liable is that the morgagee's remedy is limited to foreclosing on the securing property," and that this "difference does not alter the nature of the obligation; its only effect is to shift from the borrower to the lender any potential loss caused by devaluation of the property." Tufts, 461 U.S. at 311-12. Hence, "[w]hen the obligation is canceled, the mortgagor is relieved of his responsibility to repay the sum he originally received and thus realizes value to that extent." Id. at 312.

From <u>Tuft</u>'s reasoning, it is apparent that the lack of distinction between a nonrecourse and a recourse debt for discharge of indebtedness purposes does not negate but rather reinforces the applicability of the contested liability doctrine in this case. Because a nonrecourse debt is an enforceable obligation to repay, the cancellation of that debt would result in discharge of indebtedness income. Although the mortgagee's only remedy upon default is acquisition of the secured property, that limited remedy does not affect the mortgagor's gain upon cancellation of the mortgage. That gain is the difference between the original amount of the debt which the mortgagor was obligated to repay and the canceled balance. In contrast, the borrower realizes <u>no economic gain</u> in the settlement of disputed debt which is unenforceable for reasons relating back to the origin of the debt. The settlement determines the original amount of liability. <u>See</u> <u>N. Sobel</u>, 40 B.T.A. at 1265; <u>Zarin</u>, 916 F.2d at 116. On the other hand, cancellation of an enforceable debt would realize income to the extent of the discharge. <u>See</u> <u>United States v. Kirby Lumber Co.</u>, 284 U.S. 1, 2 (1931).

Thus, contrary to the majority's reasoning, I believe an unenforceable debt is not the functional equivalent of a nonrecourse loan either in concept or in consequence, and the enforceability of a debt is of critical importance for purposes of the contested liability doctrine. Indeed, although cancellation of a nonrecourse loan ordinarily would result in discharge of indebtedness income, cancellation of a

-12-

nonrecourse loan which is unenforceable for a reason relating back to the origin of the loan might have no tax consequences. *Cf.* Culp & Marsh, *supra*, at 292 (both nonrecourse and recourse debts may "give rise to a good faith dispute to which" the contested liability doctrine might be applied).

The majority suggests another limitation to the contested liability doctrine, stating that "even if the Preslars could demonstrate the property was worth less than the purchase price, they still could not invoke the contested liability doctrine in the absence of proof the loan they executed was tainted by fraud or material misrepresentations." *Ante* at 20. It is unclear whether the majority would require a showing of fraud or material misrepresentation in all invocations of the contested liability doctrine or only in cases where the value of property purchased is less than the stated purchase price. Regardless, no case law or commentary on the doctrine of contested liability requires proof of fraud or material misrepresentation generally or in the case at hand. Although the majority cites *Commissioner v. Sherman*, 135 F.2d 68 (6th Cir. 1943), nowhere in the case does the Sixth Circuit state or imply the limitation suggested by the majority. Indeed, in reaching its holding that the taxpayers did not realize discharge of indebtedness income, *Sherman* did not discuss the contested liability doctrine, but rather relied on the purchase-price reduction doctrine. *See id.* at 70.

Moreover, I believe the majority's focus on the value of the property

-13-

received is misplaced. For purposes of the contested liability doctrine, the value of what a taxpayer <u>receives</u> as consideration for entering into debt is not in itself dispositive. Instead, what is critical is what a taxpayer <u>gives up</u>, as that amount goes to the taxpayer's liability. <u>See</u> Culp & Marsh, supra, at 290 ("The disputed liability doctrine should focus on the indebtedness created, not on the property received.") In this case, however, it just so happens that the value of what the Preslars actually received (the Ranch) is probative of what the Preslars actually gave up (their indebtedness to Moncor Bank), because Moncor Bank agreed from the outset to an inflated medium of repayment on its loan to match an inflated purchase price for the Ranch.

## II. Purchase-Money Debt Reduction under I.R.C. § 108(e)(5)

I believe the Preslars' have a potential argument that their settlement with the FDIC falls within the purchase-money debt reduction exception of I.R.C. § 108(e)(5), thereby rendering the settlement non-taxable. Although § 108(e)(5) only applies to reduction agreements between purchasers and sellers, the provision might possibly apply to the settlement between the Preslars and the FDIC. Section 108(e)(5) may apply because the FDIC merely took Moncor Bank's place as its receiver, and Moncor Bank could be viewed for these purposes as the seller of the Ranch. Although High Nogal had formal title to the Ranch at the time it was

-14-

transferred to the Preslars, it is arguable that the substantive attributes of title had already passed to Moncor Bank at the time of negotiations between Moncor Bank and the Preslars. The owner of High Nogal did not participate in the six-month negotiations leading up to the sale of the Ranch, ( see Aplt. App. # 2 at 3), considered the Bank the "true seller," (Tr. at 118-19), and told Preslar to deal with the Bank because he had no control over any sale of the property, ( Id. at 77-78). Additionally, the Bank financed the deal and received and disposed of all the assets of the sale without High Nogal's involvement. ( Id. at 117-18.) In fact, the owner of High Nogal did not even know the particulars of the deal, only the dollar amount. ( Id. at 118.) Thus, from my review of the record, I believe Moncor Bank may have had de facto title to the Ranch. See United States v. Hall , 307 F.2d 238, 241 (10th Cir. 1962) (stating, in deciding that taxpayer did not realize discharge of indebtedness income, that "[c]ourts need not apply mechanical standards which smother the reality of a particular transaction") [6]; cf. Danenberg v. Commissioner , 73 T.C. 370, 382 (1979) (finding taxpayer to be seller of collateral where bank controlled final purchase price but owner in all other respects "was active in

---

[6]The majority questions the "continued viability" of Hall in light of Tufts, but Tufts does not put into doubt the "hardly . . . exceptional" "idea that 'Courts need not apply mechanical standards which smother the reality of a particular transaction.'" Zarin , 916 F.2d at 116 n.11 (quoting Hall, 307 F.2d at 241). Morever, as discussed supra Part I, Tufts' holding on nonrecourse loans does not implicate the contested liability doctrine.

arranging the disposition of such assets"); Allen v. Courts, 127 F.2d 127, 128 (5th Cir. 1942) (stock broker who financed purchase of seat on New York Stock Exchange deemed "in effect" seller of seat). Because the Tax Court did not reach this issue, I would remand for a finding as to who was the actual seller of the Ranch.

In sum, I would AFFIRM the Tax Court's holding that the contested liability doctrine precludes the Preslars from recognizing discharge of indebtedness income, although I would REMAND for a finding as to whether the Preslars participated in fraud in their deal with Moncor Bank, as unclean hands would prevent them from taking advantage of the equitable doctrine. Alternatively, because the Preslars might be entitled to a purchase-money debt reduction under I.R.C. § 108(e)(5) if Moncor Bank was the true seller of the Ranch, I would REMAND for a finding as to whether the seller of the Ranch in fact was Moncor Bank. For these reasons, I respectfully dissent.