T.C. Summary Opinion 2018-36

UNITED STATES TAX COURT

JACQUES L. FRENCH AND SHERRY L. FRENCH, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14777-15S.                    Filed July 12, 2018.

Michelle L. Drumbl and Roland O. Hartung (student), for petitioners.

Timothy B. Heavner and Matthew S. Reddington, for respondent.

SUMMARY OPINION

LEYDEN, Special Trial Judge:  This case was heard pursuant to the

provisions of section 7463 of the Internal Revenue Code in effect when the

petition was filed.[1]  Pursuant to section 7463(b), the decision to be entered is not

_____

[1]Unless otherwise indicated, all section references are to the Internal

(continued...)

reviewable by any other court, and this opinion shall not be treated as precedent for any other case.

In a notice of deficiency dated April 13, 2015, respondent determined a deficiency in petitioners' 2012 Federal income tax of $7,231 and a section 6662(a) accuracy-related penalty of $1,446. After concessions by the parties,[2] the issue for decision is whether the settlement payment Mr. and Mrs. French received in 2012 is excludable from their gross income in part under the disputed debt doctrine and in part under section 104(a)(2). The Court holds that the settlement payment is not excludable from their gross income for 2012.

## Background

Some of the facts are stipulated and are so found. Mr. and Mrs. French resided in Virginia when they timely filed their petition.

---

[1](...continued)
Revenue Code, as amended, in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]Respondent has conceded that Mr. and Mrs. French are not liable for the sec. 6662(a) accuracy-related penalty for 2012. Mr. and Mrs. French do not dispute that they received a settlement payment from Bank of America of $41,333.34 in 2012, but they dispute whether it must be included in gross income for 2012. The other adjustments in the notice of deficiency to a deduction for medical expenses on Schedule A, Itemized Deductions, and to the amount of taxable Social Security retirement income are computational. These adjustments will be resolved by the Court's resolution of the issue for 2012 and will not be discussed further.

I.      Bank of America Loan

In July 2008 Mr. and Mrs. French obtained a loan to purchase their personal residence.  At some point thereafter Bank of America acquired that loan and continued to own it during 2012.  In August 2009 BAC Home Loans Servicing, LP (BAC), a wholly owned subsidiary of Bank of America, became the loan servicer for Bank of America.[3]  In December 2009 Mr. and Mrs. French requested a loan modification through BAC.  In late December 2009 they signed a modification agreement (hereinafter first modification agreement).  It was their understanding that the first modification agreement was effective February 1, 2010.

II.     Impact of Bank of America's Phone Calls on Mrs. French's Recovery

Mrs. French suffered from lower back and leg pain caused by a herniated disc that affected her ability to walk, work, and perform other activities.  She required back surgery to alleviate her symptoms and was admitted to the hospital on October 13, 2009, for back surgery and discharged on October 15, 2009.

From late 2009 and into early 2010, Mr. and Mrs. French began to receive phone calls from Bank of America alleging that they were delinquent on their loan

---

[3]Hereinafter, where appropriate, BAC and Bank of America are sometimes collectively referred to as Bank of America.

and that their mortgage was about to go into foreclosure. The phone calls were made to their landline. Mr. French would answer the phone when he was home. When he was at work Mrs. French, her parents (who cared for Mrs. French while Mr. French was at work), or Mr. and Mrs. French's daughter would answer the phone. It is not clear whether Mrs. French answered the phone when her parents or her daughter were available to do so.

Mr. French worried about the effect of the phone calls on Mrs. French's recovery because the doctor had ordered bed rest and avoidance of stress. Mr. French requested that Bank of America contact only him because of Mrs. French's medical problems, but they continued calling the landline. When he spoke with a Bank of America representative, he would try to explain the situation with respect to their loan modification. However, Mr. and Mrs. French would receive calls from multiple branches within Bank of America, and Mr. French would have to explain the same thing to multiple representatives. Mr. French testified that after he answered the phone calls he would explain to Mrs. French what was going on "but in a more loving way". Sometimes he would not tell her immediately because she was in pain and he wanted her to rest.

Meanwhile Mrs. French began experiencing lower back pain again and was readmitted to the hospital from December 26 to 30, 2009, January 4 to 6 and 19 to

21, 2010.  She underwent surgery again during each of the two hospital stays in January 2010.

The number of phone calls from Bank of America increased in January 2010.  Mr. French estimated receiving a phone call from Bank of America at least once a day during that month but some days received up to five.  Mr. and Mrs. French were upset by the constant phone calls and did not know what to do to resolve their situation with Bank of America.  They received the most disturbing phone call after Mrs. French was discharged from the hospital on January 21, 2010.  Mrs. French answered the phone call from Bank of America, and the Bank of America representative "said that officers [were] on the way to evict * * * [Mr. and Mrs. French] from the house".

On or about January 23, 2010, Mrs. French began to experience shortness of breath and chest pain.  She was admitted to an intensive care unit on January 26, 2010, with respiratory failure due to a large pulmonary emboli and put on ventilator support.  Mr. French testified that Mrs. French suffered two pulmonary emboli, passed away twice during this period, was resuscitated, and was in a medically induced coma for several days.  After making a recovery, Mrs. French was discharged from the hospital on February 4, 2010.  Mrs. French suffered from acute asthma before the hospitalization and would only sometimes use her rescue

inhaler. Following that hospitalization, however, she used an inhaler more frequently. The record does not contain any evidence that Mrs. French was hospitalized after February 4, 2010.

III.    Bank of America Settlement

While Mrs. French was in the hospital, Mr. French sought legal counsel to handle the Bank of America phone calls. The phone calls from Bank of America continued through February 2010 until Mr. and Mrs. French retained counsel.

A.    Complaint Allegations

Mr. and Mrs. French, through their attorneys Steven M. Blatt and Thomas D. Domonoske, filed a complaint on November 1, 2011, in the Circuit Court for Rockingham County, Virginia,[4] against Bank of America and BAC. The complaint alleged, among other things: "As a result of BAC's actions, * * * [Mr. and Mrs. French] have suffered lost time, inconvenience, distress, fear, and have been denied the benefit of the loan modification they were promised, and are being charged too much on their loan." Mr. and Mrs. French alleged the following in their complaint to support their claims for relief.[5]

---

[4]Bank of America removed the case to the U.S. District Court for the Western District of Virginia, Harrisonburg Division.

[5]The remaining paragraphs in this Part III.A. are the factual assertions

(continued...)

As of November 2009 they did not have any delinquent unpaid interest outstanding on the loan, which was subject to an interest rate of 6.375%. In December 2009 petitioners requested the first loan modification. The new terms for the loan under the proposed first modification agreement were: (1) a principal balance of $159,637.84,[6] (2) an interest rate of 5.125% effective January 1, 2010, (3) monthly payments of $869.21 for interest and principal, (4) a payment start date of February 1, 2010, and (5) a payment end date of August 1, 2038. On December 29, 2009, Mr. and Mrs. French signed the proposed first modification agreement and returned it to BAC with a payment of $1,067.10[7] made by cashier's check.

Pursuant to the proposed first modification agreement, BAC should have adjusted the accounting records on the loan to show the new principal balance of $159,637.84 with the proposed first payment due on February 1, 2010. Instead,

---

[5](...continued)
petitioners alleged in the complaint which the parties stipulated.

[6]BAC added capitalized delinquent interest of $4,118.67 to the new principal. Mr. and Mrs. French relied on BAC's statement of accounting when they signed the proposed first modification agreement but in their complaint alleged that the delinquent interest was at most $1,085.46 for the accrued interest for November and December 2009.

[7]After including insurance and taxes, the monthly payment under the proposed first modification agreement was supposed to be $1,067.10.

sometime in January 2010 BAC began threatening Mr. and Mrs. French with foreclosure, claiming they were in default on their original loan note. On January 5, 2010, BAC sent them a notice that their mortgage was about to go into foreclosure.[8]

Mr. French spoke by telephone with a BAC representative during the first week in January 2010. The BAC representative asked him why he had not returned the proposed first modification agreement to BAC. He explained that he and Mrs. French had returned the proposed first modification agreement with a payment of $1,067.10. The BAC representative notified him that the company that had sent them the proposed first modification agreement was not a Bank of America company. That representative instructed Mr. and Mrs. French to send to BAC a copy of the proposed first modification agreement, to stop payment on the cashier's check, and to send a new cashier's check of $1,067.10 to BAC. Mr. and Mrs. French followed those instructions.

After several telephone conversations in January 2010, the BAC representative notified Mr. and Mrs. French that Bank of America had agreed to accept the proposed first modification agreement, that the modification case was

---

[8]The notice that BAC sent about the foreclosure was sent to Mr. and Mrs. French more than two weeks before the phone call on January 21, 2010, that they assert triggered Mrs. French's shortness of breath and chest pains. See supra p. 5.

considered closed, and that they should proceed to make their payments based on that agreement. Mr. and Mrs. French made the following payments in 2010 on the basis of what they believed was the accepted first modification agreement:

| Payment date | Amount |
|---|---|
| Dec. 29, 2009[1] | $1,067.10 |
| Jan. 14, 2010 | 1,069.00 |
| Feb. 16, 2010 | 1,067.10 |
| Mar. 28, 2010 | 1,067.10 |
| Apr. 26, 2010 | 1,067.10 |
| May 21, 2010 | 1,067.10 |
| June 27, 2010 | 1,067.10 |
| July 29, 2010 | 1,067.10 |
| Aug. 27, 2010 | 1,067.10 |
| Sept. 28, 2010 | 1,067.10 |
| Total | 10,672.90 |

[1]Mr. and Mrs. French subsequently canceled the cashier's check they had sent to a company that BAC informed them was not associated with Bank of America; they sent a new cashier's check in the same amount to BAC in January 2010. See supra p. 8.

However, BAC did not process the proposed first modification agreement as agreed and continued to assess interest at the interest rate on the original loan rather than at the lower rate specified in the proposed first modification agreement. Also, BAC did not apply Mr. and Mrs. French's monthly payments for January

through September 2010 to the principal, accrued interest, or escrow. Instead, BAC placed the payments for February through August 2010 into a separate, non-interest-bearing account and treated the payments as if they were related to fees on the loan processing.

In October 2010 a BAC representative spoke with Mr. French by telephone and notified him that Bank of America had decided not to honor the proposed first modification agreement, that their original loan was severely delinquent, and that they had to submit another modification agreement or their mortgage would go into foreclosure. On October 27, 2010, BAC sent them another proposed modification agreement (hereinafter second modification agreement), which would modify the original loan. In that agreement BAC notified Mr. and Mrs. French that they were in default on their original loan and that BAC would complete collection action, including foreclosure, if they did not sign the proposed second modification agreement.

The proposed second modification agreement contained the following terms: (1) a principal balance of $169,055.49, (2) an interest rate of 4.625% effective January 1, 2010, (3) monthly payments of $869.18 for interest and principal, (4) a payment start date of January 1, 2010, and (5) a payment end date of August 1, 2040. The proposed second modification agreement included

delinquent accrued interest of $12,291.88, calculated under the original interest rate, for September 2009 through December 2010 and delinquent escrow of $13,686.32. It did not address the application of the payments Mr. and Mrs. French had made during 2010. To prevent their mortgage from going into foreclosure Mr. and Mrs. French signed the proposed second modification agreement on November 4, 2010, and Bank of America accepted it. Thereafter they repeatedly requested clarification from BAC on the status of the payments they made in 2010 but did not receive adequate responses.

In September 2011 BAC sent Mr. and Mrs. French a notice stating that if they paid less than the full amount of a monthly mortgage payment, BAC would not apply the payment to their loan and would instead return the payment to them. BAC initially accepted Mr. and Mrs. French's payment of $1,067.10 for September 2011 but in October 2011 sent them a notice with the September 2011 check asserting that the September 2011 payment was for less than the full amount of their monthly mortgage payment. According to the complaint "[t]he notice was incorrectly based on the assumption and assertion that the amount of * * * [Mr. and Mrs. French's] monthly payment had been unilaterally increased by BAC to $1,081.49." Shortly thereafter Mr. and Mrs. French filed the complaint.

B.     Relief Requested in Complaint

The complaint set forth six claims for relief.  First, Mr. and Mrs. French requested that the proposed first and accepted second modification agreements be revised into one agreement that reflected the intent of the parties.  Second, they requested that the accepted second modification agreement be rescinded because Bank of America's misrepresentations and failure to provide truthful and accurate information constituted fraud and a lack of consideration for the accepted second modification agreement.

Third, Mr. and Mrs. French requested punitive damages on a claim of conversion.  They alleged that Bank of America's failure to allocate their payments and BAC's improper accounting constituted a conversion of the payments for Bank of America's own use.  They also alleged that the conversion of the payments caused their loan account to be treated as if it were in default and that BAC refused to correct its accounting and to answer questions about its actions when notified.  They further alleged that Bank of America acted knowingly and willfully or in conscious disregard of the law and their rights, which justified the award for punitive damages.

Fourth, Mr. and Mrs. French requested damages, including punitive damages, on a claim of fraud.  They alleged that BAC used its position of power

and authority over the accounting of their loan payments to mislead them and to place them in fear of losing their home to foreclosure. They also alleged that BAC had a duty to provide them with timely and accurate information about their loan but knowingly made false misrepresentations to them about the amount of the delinquent interest, the loan's being in default, and its right to foreclose. They also alleged that they relied on those misrepresentations to their detriment and suffered damages of $50,000 as a result of their reliance. According to the complaint, BAC acted knowingly and willfully or in conscious disregard of the law and Mr. and Mrs. French's rights, which justified the award for punitive damages.

Fifth, Mr. and Mrs. French requested that Bank of America be estopped from denying that the proposed first modification agreement was binding, denying that they had performed it, asserting or maintaining the validity of the accepted second modification agreement, unilaterally increasing the amount of the monthly payment to $1,081.49, declaring them in default, accelerating the loan, and initiating or pursuing foreclosure proceedings against them.

Sixth, Mr. and Mrs. French requested additional damages of $1,000 under part of the Real Estate Settlement Procedures Act (RESPA), as codified at 12 U.S.C. sec. 2605(f)(1)(B). According to Mr. and Mrs. French, BAC received a

qualified written request under 12 U.S.C. sec. 2605(e) from them but failed to make appropriate corrections to their loan account within 60 days of the request, failed to conduct an investigation on the matters raised in the request, and failed to provide them with a proper written response. They alleged that BAC was liable for all damages associated with its failure to respond to their request and that the failure to respond was the result of a pattern or practice of noncompliance.

In sum, in addition to the equitable relief sought, Mr. and Mrs. French requested damages of $50,000, additional damages under 12 U.S.C. sec. 2605(f)(1)(B) of $1,000, punitive damages not to exceed $350,000, reasonable attorney's fees, costs, and any other relief deemed appropriate. The complaint did not seek any relief for personal physical injuries or physical sickness with respect to Mrs. French.

C.    Correspondence Before Mediation Conference

According to Mr. Domonoske, who represented Mr. and Mrs. French in their lawsuit, Bank of America immediately agreed to hold a mediation conference after the complaint was filed. In a letter dated February 9, 2012, to Bank of America's attorney (hereinafter demand letter), Mr. Domonoske detailed Mr. and Mrs. French's demand for a settlement:

[I]t has two parts--giving * * * [Mr. and Mrs. French] the benefit of the bargain on the loan modification as promised, and a cash payment. The cash payment has three parts--the stress, inconvenience, and lost time caused by the repeated * * * [Bank of America] misconduct, punitive damages to send a message that such behavior must never be repeated, and attorney's fees.

With respect to the cash payment, Mr. and Mrs. French demanded $197,500 for compensatory and punitive damages, substantially less than the amount of damages requested in the complaint. In that letter Mr. Domonoske alleged that Bank of America's repeated and persistent foreclosure misconduct caused Mr. and Mrs. French "tremendous anxiety and stress" and "forced them to spend lots of time trying to get * * * [Bank of America] to act properly." He further alleged:

In this instance, Mrs. French has suffered greatly because, as a result of operations and hospitalizations for a back injury, she was told by her doctor that she had to avoid stress. Instead of home being a sanctuary where she could recover, her home was inundated with calls from * * * [Bank of America] threatening foreclosure. Mr. French would promise her that it would be all right, that he would take care of it, that they could not lose their home when they were making their payments, that he would speak with the local bank people, and that he would get it straightened out. Although he did these things repeatedly and repeatedly was given assurances that it was fixed, it never was fixed. His inability to get * * * [Bank of America] to act properly and protect his wife from this stress then caused great strain on their marriage. This harm, that never should have occurred, is compensable. Although Mrs. French's initial injury was not caused by * * * [Bank of America], the constant barrage of phone calls to this couple, who were making their payments and who had a binding permanent loan modification agreement, resulted in particular harm to them.

On February 20, 2012, the day before the mediation conference, Mr. Domonoske emailed Bank of America's attorney about the following proposed terms for resetting the loan account: (1) an interest rate of 4.625%; (2) a principal and interest monthly payment of $869.16; (3) a total monthly payment, including escrow and private mortgage insurance, of $1,081.55; and (4) a principal balance of $164,811.74 as of February 21, 2012. In the body of the email Mr. Domonoske stated: "I will let you know that my numbers show the true principal balance is about $7,500 less than the amount used here, after applying all payments timely. I understand that we adjust this on our side out of the cash payment, but I wanted you to know what I am telling Mr. and Mrs. French about that adjustment."

Subsequently, a confidential mediation conference was held. Mr. Domonoske could not testify as to the parties' discussions during the mediation conference because those discussions were confidential. See infra note 10.

D.    Resolution of Mr. and Mrs. French's Claims

Following the mediation conference, Mr. and Mrs. French reached a settlement with Bank of America[9] and signed a Confidential Settlement Agreement and Release (hereinafter settlement agreement) effective March 1,

---

[9]Bank of America signed the release in its own capacity and as successor in interest to BAC.

2012.[10]  The settlement agreement states:  "The Parties hereto wish to resolve all disputes between them, asserted or unasserted, related to the Complaint and the Allegations therein, without admission of any liability."

With respect to the loan, Mr. and Mrs. French and Bank of America agreed "that the terms of * * * [Mr. and Mrs. French's] mortgage loan shall be substantially unchanged but that the monthly payments, which are currently $1,081.55 per month including principal, interest, and escrow, are subject to increases or decreases necessary to properly maintain the escrow account otherwise required by law, or allowed by prior agreements of the Parties."  Bank of America did not change the principal amount of the mortgage that was then due. Bank of America also agreed to submit a request to all major credit bureaus to report that Mr. and Mrs. French's loan account was current and to list the loan account as current from August 2009 through March 2012.

---

[10]The settlement agreement provides:

> The Parties agree to keep the terms of this Agreement and all Released Matters confidential.  The intent of the confidentiality provision of this Agreement is to prevent overt and intentional publicity regarding the protected information * * * [D]isclosure of the protected information shall be permitted to the extent necessary by both Parties * * * to comply with other requirements of law including any regulatory authority, court orders, government investigations, or subpoenas.

Under the settlement agreement, Bank of America agreed to pay Mr. and Mrs. French $62,000 in two payments: (1) a check of $41,333.34 made payable to them and (2) a check of $20,666.66 made payable to the law firm representing them. The settlement agreement does not specify whether the $41,333.34 related to the requested damages, additional damages, or punitive damages. The settlement agreement does not refer to any personal physical injuries or physical sickness suffered by Mrs. French. Bank of America reported the settlement payment of $41,333.34 to Mr. and Mrs. French and the Internal Revenue Service (IRS) on Form 1099-MISC, Miscellaneous Income.

IV.    2012 Tax Return and Notice of Deficiency

Mr. and Mrs. French timely filed their 2012 Federal joint income tax return reporting gross income consisting of wages and taxable Social Security benefits. They did not report the settlement payment.

The IRS issued the notice of deficiency for 2012 in this case determining, among other things, a deficiency arising from the unreported settlement payment of $41,333.34 that Mr. and Mrs. French had received in 2012. Mr. and Mrs. French timely filed a petition seeking redetermination of the deficiency. In their petition they dispute the IRS' determination that the settlement payment must be included in gross income.

## Discussion

Generally, the Commissioner's determination of a deficiency is presumed correct, and a taxpayer bears the burden of proving it incorrect. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). With respect to any relevant factual issue, under section 7491(a)(1) the burden of proof may shift to the Commissioner if the taxpayer produces credible evidence with respect to that issue and meets other requirements. Mr. and Mrs. French have neither argued that section 7491(a)(1) applies nor established that its requirements are met. The burden of proof remains with them.

Except as otherwise provided, gross income includes income from all sources. Sec. 61(a). This definition has broad scope, and exclusions from gross income must be narrowly construed. Commissioner v. Schleier, 515 U.S. 323, 327-328 (1995); United States v. Burke, 504 U.S. 229, 233 (1992); Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 429-430 (1955).

Litigation settlement proceeds constitute gross income unless the taxpayer proves that the proceeds fall within a specific statutory exclusion. Commissioner v. Schleier, 515 U.S. at 328; Save v. Commissioner, T.C. Memo. 2009-209, 2009 Tax Ct. Memo LEXIS 211, at *3. Mr. and Mrs. French argue that two exclusions

apply in this case: (1) that the disputed debt doctrine applies to $7,500 of the settlement payment and (2) that section 104(a)(2) applies to the remaining portion.

This Court recognizes that Mr. and Mrs. French suffered significant distress as a result of Bank of America's conduct and threats to foreclose on their mortgage. However, they have not carried their burden of proving that the settlement payment was made with respect to a disputed debt or on account of Mrs. French's personal physical injuries or physical sickness.

## I.    Disputed Debt Doctrine

Mr. and Mrs. French argue that they may exclude $7,500 of the settlement payment from gross income under the disputed debt doctrine, also know as the contested liability doctrine. A taxpayer who has incurred a debt all or a portion of which is later discharged or forgiven, generally, has realized an accession to wealth. See United States v. Kirby Lumber Co., 284 U.S. 1, 3 (1931). The rationale of this principle is that the discharge of a debt for less than its face value accords the debtor an economic benefit equivalent to income. Id.; Cozzi v. Commissioner, 88 T.C. 435, 445 (1987). Accordingly, when the taxpayer's obligation to repay a debt is settled for less than the amount of the face value of the debt, the taxpayer ordinarily realizes income from the discharge of indebtedness. Sec. 61(a)(12); see Warbus v. Commissioner, 110 T.C. 279, 284

(1998) (citing <u>Vukasovich, Inc. v. Commissioner</u>, 790 F.2d 1409, 1413-1414 (9th Cir. 1986), <u>aff'g in part, rev'g in part</u> T.C. Memo. 1984-611). If the debt, or portion thereof, that is discharged arises from a disputed debt, the amount discharged does not give rise to discharge of indebtedness income if the taxpayer disputes the original amount of the debt in good faith and the debt is subsequently settled. <u>Preslar v. Commissioner</u>, 167 F.3d 1323, 1327 (10th Cir. 1999) (citing <u>Zarin v. Commissioner</u>, 916 F.2d 110, 115 (3d Cir. 1990), <u>rev'g</u> 92 T.C. 1084 (1989)), <u>rev'g</u> T.C. Memo. 1996-543.

Although Mr. and Mrs. French seek to recharacterize a portion of the settlement payment as a discharge of the debt owed, the settlement agreement in this case is devoid of any reference settling their loan for less than its face value. In the settlement agreement Bank of America agreed to pay to them $62,000 but did not allocate any portion of this payment to a disputed debt. Mr. Domonoske testified that Bank of America alleged it could not get BAC to make an adjustment to the principal balance because BAC was unwilling to admit fault. According to Mr. and Mrs. French, in lieu of adjusting downward the principal balance on the loan as part of the settlement, Bank of America rectified the disputed principal balance by including the disputed amount in their settlement payment.

However, in the settlement agreement Mr. and Mrs. French and Bank of America ultimately agreed that the terms of the loan were "substantially unchanged". Leading up to the mediation conference, Mr. and Mrs. French and Bank of America continued to disagree on the amount of the principal balance of the loan moving forward. In the email dated February 20, 2012, Mr. Domonoske asserted that the principal balance after the settlement was about $7,500 less than Bank of America's calculation. Mr. Domonoske testified that Bank of America never agreed on the $7,500 difference but decided it was "going to pay * * * [Mr. and Mrs. French] more than enough for [them] to carve that up however * * * [they] want." Nevertheless, after the mediation conference and pursuant to the settlement agreement, Mr. and Mrs. French remained liable for the full principal balance specified in the accepted second loan modification agreement. They therefore did not settle their obligation to repay the loan for less than the face value of the debt. Accordingly, none of the loan was discharged and the disputed debt doctrine does not apply in this case. See Warbus v. Commissioner, 110 T.C. at 284.

Mr. and Mrs. French alternatively argue that the $7,500 should be excluded from gross income because it constituted a refund or reimbursement and therefore was not an accession to wealth. They cite IRS Chief Counsel Advice 200721017

(May 25, 2007) as support for their contention that a refund of an overpayment made to satisfy a liability is not an accession to wealth. A written determination of the Commissioner, including Chief Counsel advice, may not be used or cited as precedent. Sec. 6110(b)(1)(A), (k)(3); see Elbaz v. Commissioner, T.C. Memo. 2015-49, at *8 ("[W]e may not use or cite as precedent IRS Chief Counsel Advice * * * in deciding this case.").

Even so, Mr. and Mrs. French have not shown how the $7,500 portion of the settlement payment was attributable to a refund or reimbursement. To the extent they suggest that the $7,500 was a refund of the payments they made to Bank of America during 2010, the record does not support this contention. The 10 payments Mr. and Mrs. French made to Bank of America from December 29, 2009, to September 28, 2010, totaled $10,672.90, more than the amount they assert constituted a refund. The Court finds Mr. Domonoske's testimony credible that calculating the exact amount of the disputed principal balance was difficult given Bank of America and BAC's inability to provide an accurate record of the accounting on the loan. However, Mr. and Mrs. French have not shown that a $7,500 portion of the settlement payment constituted a refund or reimbursement instead of compensatory damages.

II.    Section 104(a)(2)

The exclusion from gross income upon which Mr. and Mrs. French rely for the remaining portion of the settlement payment is section 104(a)(2). It provides that gross income does not include "the amount of any damages (other than punitive damages) received (whether by suit or agreement * * *) on account of personal physical injuries or physical sickness". Sec. 104(a)(2). Congress intended this exclusion to cover damages that flow from a physical injury or physical sickness. See H.R. Conf. Rept. No. 104-737, at 301 (1996), 1996-3 C.B. 741, 1041. Emotional distress is not treated as a personal physical injury or physical sickness, except for damages not in excess of the cost of medical care attributable to emotional distress. Sec. 104(a) (flush language).

When damages are received under a settlement agreement, the nature of the claim that was the actual basis for the settlement determines whether the damages are excludable under section 104(a)(2). United States v. Burke, 504 U.S. at 237. The nature of the claim is typically determined by reference to the terms of the agreement. See Knuckles v. Commissioner, 349 F.2d 610, 613 (10th Cir. 1965), aff'g T.C. Memo. 1964-33; Robinson v. Commissioner, 102 T.C. 116, 126 (1994), aff'd in part, rev'd in part, and remanded on another issue, 70 F.3d 34 (5th Cir. 1995). The "key question" is: "In lieu of what were the damages awarded?"

Robinson v. Commissioner, 102 T.C. at 126-127 (quoting Raytheon Prod. Corp. v. Commissioner, 144 F.2d 110, 113 (1st Cir. 1944), aff'g 1 T.C. 952 (1943)).  If the agreement does not explicitly state which claims the payment was made to settle, the "dominant reason for [the payor's] making the payment" is critical.  Green v. Commissioner, 507 F.3d 857, 868 (5th Cir. 2007), aff'g T.C. Memo. 2005-250; Bent v. Commissioner, 87 T.C. 236, 244 (1986), aff'd, 835 F.2d 67 (3d Cir. 1987).

The intent of the payor is determined by taking into consideration all of the facts and circumstances, including the amount paid, the circumstances leading to the settlement, and the allegations in the injured party's complaint.  Green v. Commissioner, 507 F.3d at 868.  "[T]he nature of underlying claims cannot be determined from a general release that is broad and inclusive."  Ahmed v. Commissioner, T.C. Memo. 2011-295, 2011 Tax Ct. Memo LEXIS 291, at *8-*9, aff'd, 498 F. App'x 919 (11th Cir. 2012).

The Court first looks to the terms of the settlement agreement to determine the nature of the claims that was the actual basis for the settlement.  Pursuant to the settlement agreement, Mr. and Mrs. French agreed to a total payment of $62,000 from Bank of America to settle their case.  A portion of that payment, $20,666.66, was specifically allocated to attorney's fees.  The settlement agreement, however, does not further allocate the remaining $41,333.34.  Instead,

it cross-references the complaint and states that the settlement was intended to "resolve all disputes between them, asserted or unasserted, related to the Complaint and the Allegations therein, without admission of any liability." Therefore, the Court turns to the complaint to determine the disputes settled between Bank of America and Mr. and Mrs. French.

In the complaint Mr. and Mrs. French made six claims for relief, three of which were equitable claims for relief (i.e., revision of the two modification agreements, rescission of the accepted second modification agreement, and estoppel). The remaining three claims for relief were for monetary relief-- damages of $50,000, punitive damages not to exceed $350,000, and additional damages of $1,000 under 12 U.S.C. sec. 2605(f)(1)(B). For none of these claims did Mr. and Mrs. French seek compensation for Mrs. French's personal physical injuries or physical sickness. The complaint only generally alleged that they "suffered lost time, inconvenience, distress, [and] fear", none of which constitute personal physical injuries or physical sickness. Further, any harm to which the complaint referred is to both Mr. and Mrs. French.

At trial Mr. Domonoske, who drafted the complaint, testified why the complaint did not include allegations of Mrs. French's personal physical injuries or physical sickness. Mr. Domonoske testified that in drafting the complaint he

had various goals in mind. He primarily drafted the complaint for the judge and the defense lawyer to understand what Bank of America would lose in the case and to motivate Bank of America to engage seriously in mediation to resolve the case. He also drafted the complaint as efficiently as possible keeping in mind that as a plaintiff's attorney he was paid hourly under fee-shifting statutes. Mr. Domonoske testified that he also sought to preserve Mr. and Mrs. French's privacy by not disclosing aspects of their personal life and marriage and Mrs. French's medical history in a public record. He testified that trial was the appropriate place to make disclosures about Mr. and Mrs. French's private lives, but that in drafting the complaint he focused on Bank of America's wrongdoing while protecting Mr. and Mrs. French's privacy.

Nevertheless, Mr. and Mrs. French could have included in the complaint a claim for damages for Mrs. French's personal physical injuries or physical sickness but did not. Although he could not testify as to the parties' confidential discussions during the mediation conference, Mr. Domonoske testified that in seeking monetary damages Mr. and Mrs. French sought to obtain some compensation for Mrs. French's personal physical injuries and physical sickness. Mr. Domonoske relied on the statements in the demand letter to support his testimony.

However, the demand letter seeks punitive damages and compensation for injuries that either are nonphysical or arise from the emotional distress Mr. and Mrs. French suffered and from the symptoms of that emotional distress. The demand letter asserted that the demanded cash payment at that time of $197,500 consisted of three parts: "the stress, inconvenience, and lost time caused by the repeated * * * [Bank of America] misconduct, punitive damages to send a message that such behavior must never be repeated, and attorney's fees." The demand letter goes on to assert that Bank of America's conduct caused Mr. and Mrs. French "tremendous anxiety and stress" and "forced them to spend lots of time trying to get * * * [Bank of America] to act property" and that Mr. French's inability to "protect his wife from this stress then caused great strain on their marriage". None of these harms relate to personal physical injuries or physical sickness. Punitive damages and damages for emotional distress, lost time, inconvenience, distress, and fear are not excludable under section 104(a)(2). See sec. 104(a)(2); Stadnyk v. Commissioner, T.C. Memo. 2008-289, 2008 Tax Ct. Memo LEXIS 287, at *18 (holding that damages for emotional distress, mortification, and mental anguish were not excludable under sec. 104(a)(2)), aff'd, 367 F. App'x 586 (6th Cir. 2010); Sanford v. Commissioner, T.C. Memo. 2008-158, 2008 Tax Ct. Memo LEXIS 159, at *10 ("Damages received on account of

emotional distress, even when resultant physical symptoms occur, are not excludable from income under section 104(a)(2).").

Even if the Court were to infer, as Mr. and Mrs. French suggest, that the intent of Bank of America in making the settlement payment was in part intended to compensate Mrs. French for personal physical injuries or physical sickness, the record does not contain sufficient evidence to allow the Court to properly allocate any portion of the settlement payment to personal physical injuries or physical sickness. See Green v. Commissioner, T.C. Memo. 2014-23, at *11; Evans v. Commissioner, T.C. Memo. 1980-142, 1980 Tax Ct. Memo LEXIS 445, at *13. Not only do the complaint and demand letter seek punitive and emotional distress damages but the complaint was filed on behalf of both Mr. and Mrs. French. Therefore, some of the settlement payment was also intended to compensate Mr. French, and the record does not show what amounts should be allocated between Mr. and Mrs. French.

Having found that neither the disputed debt doctrine nor section 104(a)(2) applies in this case, the Court concludes that the settlement payment reported on the Form 1099-MISC of $41,333.34 is includible in full in Mr. and Mrs. French's gross income for 2012.

The Court has considered the parties' arguments and, to the extent not discussed herein, the Court concludes the arguments to be irrelevant, moot, or without merit.

To reflect the foregoing,

Decision will be entered for respondent as to the deficiency and for petitioners as to the accuracy-related penalty under section 6662(a).